Docket No. 103751.

IN THE

SUPREME COURT

OF

THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
KENNETH L. MOHR, Appellee.

*Opinion filed January 25, 2008.*

JUSTICE FITZGERALD delivered the judgment of the court,
with opinion.

Justices Freeman, Kilbride, Garman, Karmeier, and Burke
concurred in the judgment and opinion.

Chief Justice Thomas dissented, with opinion.

**OPINION**

Following a jury trial in the circuit court of Rock Island County,
defendant Kenneth Mohr was convicted of second degree murder and
sentenced to 20 years' imprisonment. See 720 ILCS 5/9–2(a)(1)
(West 2004). A divided appellate court reversed and remanded. No.
3–04–0816 (unpublished order under Supreme Court Rule 23). The
central issue in this case is whether the trial court erred in instructing
the jury on provocation in a case where the defendant was not charged
with first degree murder. For the reasons that follow, we affirm.

## BACKGROUND

On June 2, 2001, Joseph Kyser stopped to visit his wife's aunt, Sheila Sutton, on his way to work because family members had not spoken to her in more than a week. When he arrived at Sutton's house, Kyser found her back door and her garage door were both open, and newspapers were piled in her yard. Kyser entered the house and found Sutton's dead body, lying in a pool of blood on her bedroom floor. An autopsy later revealed that Sutton died from a stab wound to her neck. She was also stabbed in her shoulder, chest, lower back, and abdomen. Her face was badly bruised, and the cartilage in her neck was fractured, indicating that she had been strangled. There were no signs of defensive wounds on her body, and no signs of forced entry into her house.

Police attention soon turned to the defendant, and he was charged by information with two counts of first degree murder. Before trial, the defendant filed a motion *in limine* to bar the State from eliciting testimony from his friend Scott Reilly. According to the defendant, the State wanted Reilly to testify regarding an inculpatory statement the defendant made to him after a hypnosis session. In this statement the defendant described an altercation with Sutton in her bedroom on the night she was killed. The trial court denied the defendant's motion, finding that Reilly's testimony fell within the hearsay exception for statements against penal interest. In light of Reilly's testimony, the defendant requested, and received, second degree murder jury instructions. The defendant was convicted of second degree murder and sentenced to 20 years' imprisonment.

The appellate court reversed and remanded. *People v. Mohr*, No. 3–02–0447 (2003) (unpublished order under Supreme Court Rule 23). The appellate court stated that the defendant's inculpatory statement to Reilly was the result of hypnosis, not memory, and that, under *People v. Zayas*, 131 Ill. 2d 284, 295 (1989), the trial court abused its discretion in allowing the State to introduce Reilly's testimony regarding this statement. The appellate court then held that this error was not harmless: "While the evidence indicated that Mohr had the opportunity to kill Sutton by his presence in her home on the night of the murder, there was no physical evidence linking Mohr to the killing. Other than the statements made to Reilly, Mohr made no confession."

*Mohr*, No. 3–02–0447 (unpublished order under Supreme Court Rule 23).

On remand, the defendant was charged by information with two counts of second degree murder and one count of involuntary manslaughter. The case proceeded to trial on one count of second degree murder. At the beginning of jury selection, the judge read the information:

"The defendant in this case, Kenneth Mohr, is charged with the offense of Second Degree Murder. More specifically, the criminal information *** states that on the 25th day of May, in the year 2001, at and within the County of Rock Island, in the State of Illinois, Kenneth Lester Mohr, committed the offense of Second Degree Murder, in that the defendant while committing the offense of First Degree Murder in violation of 720 Illinois Compiled Statutes Article 5 Section 9–1(a)(2) and while acting under a sudden and intense passion resulting from serious provocation by Shiela [*sic*] Sutton, stabbed Shiela [*sic*] Sutton with a sharp object and choked Shiela [*sic*] Sutton thereby causing the death of Shiela [*sic*] Sutton."

Defense counsel did not object. In his opening statement, the prosecutor also read the information. The prosecutor stated that he would "concede the point, mitigating factor, under a sudden and intense passion resulting from serious provocation by Shiela [*sic*] Sutton. We will concede that point." Again, defense counsel did not object.

The evidence presented at the defendant's trial was similar to that presented at his first trial. The State called 11 witnesses. Kyser testified about finding Sutton's body. Shannon Jump, a bartender at the Hard Times Tavern in Moline, testified that she saw the defendant with Sutton on May 24, 2001, the night before she was killed. When she closed the Hard Times Tavern around 1 a.m. on May 25, Jump went to another bar, the Little Cowbell in East Moline, with Sutton and the defendant. According to Jump, as she left less than half an hour later, Sutton "gave me a hug and she asked me if she would be all right with [the defendant] and I told her I didn't see why not 'cause he had been in the bar with some other friends of mine he worked with and I told her just stop in and let me know how everything went." Jump never saw Sutton again.

Dr. Larry Blum, a forensic pathologist, testified about the autopsy of Sutton's body and the cause of her death. Rod Scherpe, an Illinois State Police crime scene investigator, testified about his observations at Sutton's house. According to Scherpe, there were no signs of forced entry. Though most of Sutton's blood was pooled around her body on the floor of her bedroom, Scherpe also found trace amounts on the doorway between the kitchen and the living room, on the floor of the hallway between Sutton's bedroom and bathroom, and on the floor of the bathroom. Investigators also found a foot impression on the floor of Sutton's bathroom using a protein stain called amido black.

Mary DeVine, a criminalist with the Rock Island police department, testified that she took an impression of the defendant's foot. Eileen Taylor, a forensic scientist at the Illinois State Police Morton Crime Laboratory, testified that she processed "almost the entire bathroom" in amido black after blood was found there. According to Taylor, amido black "is specific for blood proteins." She continued:

> "In the process of processing a crime scene for blood evidence it is not always apparent when you look at it that it contains any kind of blood evidence. You would think that it would normally look red. But many times there's such a small amount or impression [is] in the blood plasma which is actually the clear part of the blood that you can't see it with the naked eye. So we use a developing stain called amido black ***. So it makes the clear impression or the impression that you can't see become a dark blue as you can see in this particular piece of linoleum."

Taylor asserted that the impression on the floor of Sutton's bathroom matched the impression of the defendant's foot, specifically his right big toe.

Jennie Hahn, another forensic scientist with the Illinois State Police, testified that her report indicated there was "no blood indicated" on the linoleum adjacent to the defendant's toe print. Hahn explained that in her report she meant

> "[t]hat the only place that I was able to test on that Exhibit I couldn't just randomly swab the whole linoleum because it

-4-

was more important to see if there [was] any kind of latent print on that exhibit. So I work with a latent print examiner to determine, she determines or the analyst determines an area where they see a possible print, also now a print in blood, so I have to stay close to that area and there was some kind of staining. I removed that staining but the reaction to the testing I did, did not indicate blood [for] one or two reasons. The stain was not blood or there wasn't enough."

Hahn stated that she could not test the linoleum for blood because that would have obliterated the print. According to Hahn, blood was found at the hilt of a large serrated butcher's knife in Sutton's kitchen. Deborah Minton, another forensic scientist with the Illinois State Police, testified that the blood on the knife and in the doorway, hallway, and bathroom came from Sutton.

Rock Island County sheriff's department Deputy Mike Clary testified about the distance between Sutton's house, the Little Cowbell, and the Modernistic Motel where the defendant resided. All three locations were within approximately three miles of each other. Reilly testified that the defendant was upset after the police questioned him in connection with Sutton's death. According to Reilly, the defendant initially stated, "They just drank at Hard Times, Cow Bell and then took him home to his place at Modernistic." A week later, Reilly testified, the defendant

"flat out said that he had looked at a house, Sheila Sutton's house. She was offering him an apartment. He had nothing to do with anything other than the fact that he went there. He looked at it. He basically slept downstairs and woke up, saw that she was dead and everything and he blacked out from that point, doesn't remember anything, and he swore up and down he had nothing to do with it. He didn't do it at all."

Rock Island County sheriff's department Lieutenant Jeffrey Boyd testified about the investigation of Sutton's death and authenticated a videotaped custodial interview with the defendant, which the jury watched. During the interview, the defendant stated that he was at the Hard Times Tavern with Sutton, and went with her, Jump, and another man to the Little Cowbell. There, he told Sutton that he was living in a hotel, and she told him that she would like to rent out her basement. After 3 a.m., Sutton drove the defendant to her house.

They drank beer and talked until 4 or 5 a.m. She showed him around her house, he used the bathroom, and they went downstairs, where they talked more. Sutton said that she did not want to drive the defendant home, but that he could sleep in the basement. Sutton then went upstairs. The defendant stated that he took his shirt off and fell asleep until around 7 a.m., when he put on his shirt, called for Sutton, went upstairs, and found her body. The defendant vomited in the bathroom and fled in a panic back to his motel room, where he woke up later that afternoon and went to work. He never summoned the police after he discovered Sutton's body because he was too scared. The defendant could not recall an altercation with Sutton, nor could he recall driving her car away that morning. He insisted that he did not remove his shoes in Sutton's house. He consumed 10 to 12 beers and a few shots of liquor that night.

After the State's rested its case, the defendant made a motion for a directed verdict. The defendant's main contention was that the State had injected motive–namely, provocation–into the case without presenting any evidence on that issue. Defense counsel argued: "[T]he problem is that the jury has in front of it, and has been told twice now, once by the court and once by the State, that this occurred while the defendant was acting under a sudden, intense passion resulting in [*sic*] provocation by Sheila Sutton, and there has been no evidence to back that up." The trial court denied this motion based on *People v. Burks*, 189 Ill. App. 3d 782 (1989). The defendant then rested his case.

At the jury instruction conference, the State offered Illinois Pattern Jury Instructions, Criminal, Nos. 7.01S and 7.02S, the definition and issues instructions for second degree murder. See Illinois Pattern Instructions, Criminal, Nos. 7.01S, 7.02S (4th ed. 2000) (hereinafter IPI Criminal 4th). The State also offered IPI Criminal 4th No. 7.03, defining provocation:

> "A mitigating factor exists so as to reduce the offense of first degree murder to the lesser offense of second degree murder if, at the time of the killing, the defendant acts under a sudden and intense passion resulting from serious provocation by [(the deceased) (some other person he endeavors to kill, but he negligently or accidentally kills the deceased)]. Serious provocation is conduct sufficient to excite

an intense passion in a reasonable person." IPI Criminal 4th, No. 7.03.

The defendant objected to these instructions, renewing the argument he made in support of his directed verdict motion. The State acknowledged that IPI Criminal 4th No. 7.03

> "is obviously given in a first degree case where second degree is a factor. *** I don't think the jury necessarily needs to be instructed because it tracks the language of the statute which is already in the information, but it is alleged in the body of the information. Therefore probably appropriate that this instruction be given even it says no more than what's already in the information."

The court overruled the defendant's objections.

The prosecutor again read the information in his closing argument. Defense counsel argued in his closing that the State had presented no evidence to support its charge that the defendant was provoked, and in rebuttal, the State repeated, "Once again, the provocation, we are conceding that point. We are conceding that." The defendant was convicted of second degree murder and sentenced to 20 years' imprisonment. He filed a motion for a new trial, contending, in part, that the trial court erred in using IPI Criminal 4th No. 7.03. According to the defendant, "By the State 'conceding' the mitigation listed in the information, the jury is hearing and accepting as fact the State's theory without any factual evidence. This is reinforced by the jury being given [IPI Criminal 4th No. 7.03]." The court denied the motion, and the defendant appealed.

The appellate court again reversed, holding that the trial court erred in instructing the jury on provocation. No. 3–04–0816 (unpublished order under Supreme Court Rule 23). According to the appellate court,

> "Instructing a jury in a case where the defendant denies committing the offense that second degree murder involves a serious provocation by the deceased and then 'conceding' the existence of that provocation is, at best, confusing. *** At worst, the jury may believe that they are required to accept as true that the defendant and Sutton had an argument, despite [the] defendant's claims to the contrary, and the jury might

well believe it has little choice but to find the defendant guilty." No. 3–04–0816 (unpublished order under Supreme Court Rule 23).

The appellate court noted that the State offered no evidence of provocation at the defendant's second trial. Presenting the issue of provocation to the jury, then, meant not only that the defendant's denials were false, but also that the defendant had a motive, in addition to an opportunity, to kill Sutton. No. 3–04–0816 (unpublished order under Supreme Court Rule 23). The court continued:

> "[T]he jury was told that the State conceded the issue, implying that there was nothing to decide and that they should accept as true that 'at the time of the killing, the defendant act[ed] under sudden and intense passion resulting from serious provocation by the deceased' (IPI 7.03). Under these circumstances, it would have been remarkable if the jury had *not* returned a guilty verdict." (Emphasis in original.) No. 3–04–0816 (unpublished order under Supreme Court Rule 23).

Justice Schmidt dissented. He argued, in part, that the jury instruction error was harmless in light of the overwhelming evidence supporting the defendant's conviction. No. 3–04–0816 (Schmidt, P.J., dissenting) (unpublished order under Supreme Court Rule 23).

We allowed the State's petition for leave to appeal. 210 Ill. 2d R. 315(a). In his response brief, the defendant requested cross-relief, arguing that if this court reverses the appellate court, then it should consider whether his sentence was excessive.

## ANALYSIS

The State initially contends that the defendant has forfeited any review of the trial court's decision to use IPI Criminal 4th No. 7.03 by failing to object to the instruction during trial on the same grounds that he presented after trial and in his appeal. Though the defendant did object to IPI Criminal 4th No. 7.03 at trial, he argued that the instruction was improper for the reasons he offered in his directed verdict motion: once the jurors heard the information alleging that the defendant was provoked by the victim, the State was required "to

back that up." According to the State, the defendant presented a different argument in his posttrial motion and on appeal: there was no evidence of provocation, and thus no evidentiary basis to give IPI Criminal 4th No. 7.03.

The defendant responds that he sought to preclude, both during and after trial, the State's references to provocation. In his repeated trial objections to the State's "concession" of provocation, the defendant argued that the State should have been required to produce evidence of that provocation. According to the defendant, this argument is fully consistent with his argument in his posttrial motion that the trial court erred in giving IPI Criminal 4th No. 7.03 because no evidence on provocation was introduced at trial. The defendant asserts that the State's forfeiture contention elevates form over substance.

"Generally, a defendant forfeits review of any putative jury instruction error if the defendant does not object to the instruction or offer an alternative instruction at trial and does not raise the instruction issue in a posttrial motion." *People v. Herron*, 215 Ill. 2d 167, 175 (2005). This rule does not state that a defendant must object to the instruction on identical grounds–only that the defendant must object during and after trial. The State essentially asks us to tailor the forfeiture rule, requiring the defendant to assert the same argument at trial and in his posttrial motion as to why an instruction was improper. We decline to do so. We need not decide how closely the defendant's phrasing of his posttrial argument must match the phrasing of his trial objection because, here, they are clearly close enough. The defendant's posttrial argument that the State had no evidentiary basis for a jury instruction defining provocation tracks his trial objection that the State did not back up its charge of provocation with evidence. The fact that the defendant objected to IPI Criminal 4th No. 7.03 at trial and again in his posttrial motion is enough to preserve the issue on appeal. We turn to the merits.

Instructions convey the legal rules applicable to the evidence presented at trial and thus guide the jury's deliberations toward a proper verdict. *People v. Hudson*, 222 Ill. 2d 392, 399 (2006). There must be some evidence in the record to justify an instruction, and it is within the trial court's discretion to determine which issues are raised by the evidence and whether an instruction should be given. See

-9-

*Nassar v. County of Cook*, 333 Ill. App. 3d 289, 297 (2002). Instructions which are not supported by either the evidence or the law should not be given. *People v. Simester*, 287 Ill. App. 3d 420, 431 (1997). The task of a reviewing court is to determine whether the instructions, considered together, fully and fairly announce the law applicable to the theories of the State and the defense. *People v. Pollock*, 202 Ill. 2d 189, 210 (2002); *People v. Parker*, 223 Ill. 2d 494, 501 (2006). The proper standard of review is whether the trial court abused its discretion. *People v. Jones*, 219 Ill. 2d 1, 31 (2006). "A trial court abuses its discretion if jury instructions are not clear enough to avoid misleading the jury ***." *In re Timothy H.*, 301 Ill. App. 3d 1008, 1015 (1998).

Here, the State charged the defendant with second degree murder. Second degree murder is a unique offense because it is a lesser mitigated offense of first degree murder. *Parker*, 223 Ill. 2d at 504; *People v. Porter*, 168 Ill. 2d 201, 213 (1995) ("second degree murder is first degree murder plus mitigation"). That is, the elements of both offenses are identical; second degree murder differs from first degree murder only because of the presence of a mitigating factor, such as serious provocation. *People v. Jeffries*, 164 Ill. 2d 104, 122-23 (1995).

The State may charge second degree murder without also charging first degree murder. As the appellate court held in *Burks*, when the State charges a defendant with only second degree murder, it essentially alleges that it can prove the elements of first degree murder, but concedes that mitigating factors are present. *Burks*, 189 Ill. App. 3d at 785. The defendant bears no burden to prove any mitigating factors. *Burks*, 189 Ill. App. 3d at 785. The IPI committee drafted IPI Criminal 4th Nos. 7.01S and 7.02S to comply with *Burks*: "In effect, the State is required to prove the elements of first degree murder, but if it satisfies the jury it has done so, the only verdict and judgment to which it is entitled is guilty of second degree murder. This result follows because the State, in the *Burks* situation, has conceded the presence of the mitigating factor that reduces the defendant's criminal behavior from first degree murder to second degree murder." Illinois Pattern Jury Instructions, Criminal, No. 7.01S, Committee Note, at 189 (4th ed. 2000). IPI Criminal 4th No. 7.01S directs the court to give instruction No. 7.02S, and vice versa, but neither

instruction mentions No. 7.03. This makes sense: if there is no first degree murder charge against the defendant, there is no need to instruct the jury on the mitigating factor of provocation.

The State still argues that it was not improper for the trial court to use IPI Criminal 4th No. 7.03, which merely and correctly defines provocation, but does not require the defendant to prove provocation as a mitigating factor. According to the State, the trial court read the information against the defendant to the jury, and the defendant did not object. The State repeated the information, and again the defendant did not object. Left to wonder about the purported provocation here and how it related to the charge against the defendant, the jurors could only speculate and drift toward confusion about the governing law. IPI Criminal 4th No. 7.03, contends the State, avoided that confusion by focusing the jury's attention on the elements of second degree murder.

The defendant asserts that the fundamental problem with the State's view lies in its assumption that the jury would understand that IPI Criminal 4th No. 7.03 simply defined provocation. According to the defendant, the jury did not need to be informed of the legal reasons why he was charged with second degree murder. Inextricable from the definition of provocation was the assumption that the defendant was the person provoked. The instruction did not inform the jury that at the time of the killing "the person who acted" was acting under a strong and intense passion. Instead it contextualized provocation, specifying that it is "the defendant" who acts under a sudden and intense passion resulting from serious provocation, presumably from Sutton, his victim. In light of the State's "concession," IPI Criminal 4th No. 7.03 relieved the State of its burden of proving beyond a reasonable doubt that defendant had an altercation with Sutton before she was killed.

The trial court abused its discretion when it used IPI Criminal 4th No. 7.03 in the absence of any evidence of provocation. IPI Criminal 4th No. 7.03 did not state that provocation had occurred, but, coupled with the State's concession, may have helped to create an inference that it had. To permit the State to concede provocation, and then instruct the jury that second degree murder involves serious provocation in a case where the defendant denies that he committed the offense, posed a legitimate risk that the jury might surmise there

was unpresented evidence which showed the defendant had an altercation with Sutton. The jury could have concluded that because the State admitted provocation occurred–and reduced first degree murder to second degree murder–the defendant's denials were false, and there was a motive for the killing. As the appellate court majority noted, "[u]nder these circumstances, it would have been remarkable if the jury had *not* returned a guilty verdict." (Emphasis in original.) No. 3–04–0816 (unpublished order under Supreme Court Rule 23).

In its brief, the State insists, "Telling jurors the People had to prove provocation would have been error." That is correct, but in its petition, the State insists that it had proved provocation because its concession on that issue "had the effect of a judicial admission." That is not correct. Because the State charged the defendant with only second degree murder, provocation was not an issue in this case, and the State could not concede a nonissue, much less place it beyond doubt. Notably, the State never asked the defendant for a stipulation on provocation, and the defendant never asked the State for its concession. Without any evidence of, or reference to, provocation, the jury would have been forced to deliberate over the narrow, all-or-nothing question of whether the defendant killed Sutton. The State shifted the jury's focus away from this question.

Because of the structure of our murder statutes and the posture of this case on remand after the first appeal, the trial court, the State, and the defendant clearly were in a vexing situation. The proper approach was implicit in IPI Criminal 4th Nos. 7.01S and 7.02S. The judge did not have to inform the venire or the jury that defendant was charged with "acting under a sudden and intense passion." The judge should have stated only that the State alleged the defendant committed second degree murder by stabbing and choking Sutton, knowing that his acts created a strong probability of death or great bodily harm. That language precisely tracks the definition and issues instructions the jury would later receive and states only the elements the jury would be required to find.

The State contends that any error was harmless because there was "clear and convincing" and "overwhelming" evidence against the defendant. "An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed." *People v. Pomykala*, 203 Ill.

-12-

2d 198, 210 (2003), citing *People v. Johnson*, 146 Ill. 2d 109, 137 (1991). Here, there was some circumstantial evidence of the defendant's guilt. The defendant was in Sutton's house when she was killed. The defendant stated that he did not remove his shoes and socks inside Sutton's house, but his toe print, which may or may not have appeared in blood plasma invisible to the naked eye, was found on the bathroom floor near the bedroom where her body was found. The defendant did not report his discovery of the body, and he gave inconsistent statements to Reilly about his activities on the night that Sutton was killed. We cannot say, however, that this evidence was so overwhelming as to make the jury instruction error harmless beyond a reasonable doubt.

Because we must remand this case for a new trial, we do not reach the sentencing issue raised by the defendant.

## CONCLUSION

For the reasons that we have stated, we affirm the appellate court's decision to reverse this case and remand for a new trial.

*Affirmed.*

CHIEF JUSTICE THOMAS, dissenting:

I agree with the conclusion that it was error to give IPI Criminal 4th No. 7.03 in the absence of any evidence of provocation. But I disagree with the majority's conclusion that defendant properly preserved an objection to this trial error. The majority's erroneous conclusion that defendant properly preserved the issue leads the majority down the wrong course of applying a harmless error test that requires the State to show that the evidence was overwhelming in order to avoid a remand for a new trial. I believe that because defendant failed to properly preserve the issue, a plain error standard is instead applicable, which would place the burden on defendant to show that the evidence was closely balanced in order to warrant a new trial. Defendant has not shown that the evidence was closely balanced. I, therefore, would not reverse the conviction and remand for a new trial, as the majority does. Accordingly, I respectfully dissent.

-13-

Defendant was originally charged in this case with the first degree murder of Sheila Sutton. At the first trial, Scott Reilly, a friend of defendant, testified that defendant remembered committing the crime after undergoing hypnosis. Specifically, defendant remembered going into Sutton's bedroom. Sutton slapped defendant, a fight ensued, and defendant punched her and "choked her out." The jury convicted defendant of the lesser offense of second degree murder. The appellate court reversed and remanded for a new trial, ruling that Reilly's testimony was inadmissible.

On remand, defendant was only charged with second degree murder because the law prohibits retrial for first degree murder in this situation where defendant had been tried for first degree murder but convicted of only second degree murder.

The evidence at the second trial showed that defendant was out drinking with Sutton at two different bars on the night in question. Sutton eventually drove defendant back to her house, ostensibly so that defendant could see a room Sutton had for rent in her basement. Defendant told police after he was apprehended that he and Sutton kissed a couple of times, but that he "felt uncomfortable with what was going on" and that this was "not what he was looking for." Sutton did not want to drive defendant home that night because she had been drinking, and so she told defendant he would have to stay downstairs in her basement. Defendant had not had a driver's license for several years. Defendant claimed that he took off his shirt, but left his boots on and went to sleep in the basement at 5 a.m. He woke up around 7 a.m., went upstairs and called for Sutton. He claimed that when he got no answer, he pushed her bedroom door open and saw blood everywhere. He did not check for a pulse to see if Sutton was still alive. Instead, he vomited and then fled the scene without calling police. He said that he "immediately assumed that [he] did it" because he had been "the only one in the house."

The forensic evidence showed that Sutton had been brutally stabbed five times, had a large bruise to her face area, and had a broken larynx from choking. A knife found in the kitchen had been wiped clean, but still had some of the victim's blood on it. Traces of Sutton's blood were found throughout the bathroom near the bedroom where her body was found. Defendant's right toe print was found on this bathroom's linoleum floor. No two people in the world,

not even identical twins, can leave the same toe print. Defendant's toe print on the linoleum floor turned a dark blue when forensic scientist Eileen Taylor applied amido black to it. Amido black is a dye solution that is specific for blood proteins and will turn a blood-contaminated print a dark blue color when blood proteins are present.

There was no sign of any forced entry, and there was no evidence that anything was missing from inside the victim's home. Defendant could not remember how he got home after Sutton was murdered. Police found Sutton's car with the keys in the ignition back at the last bar where defendant and Sutton drank together.

The information on retrial had alleged that defendant committed the offense of second degree murder while acting under sudden and intense provocation. Defendant did not object to the information prior to trial. During opening statements, the prosecutor read the information and then told the jury that the State was conceding the point of the mitigating factor of sudden and intense provocation. Defendant moved for a directed verdict at the close of the State's case, arguing that the information injected motive into the case and that there was no evidence to back it up. Defendant never argued that the sudden-and-intense-provocation language should be stricken from the charging instrument. The trial court found that the State did not have any burden to prove motive and therefore denied defendant's motion for a directed verdict. Thereafter, defendant did not present any evidence on his own behalf.

At the jury instruction conference, the State tendered IPI Criminal 4th Nos. 7.01S, 7.02S and 7.03 for second degree murder. IPI Criminal 4th No. 7.01S is entitled "Definition of Second Degree Murder When First Degree Murder is Not Charged" and provides that "[a] person commits the offense of second degree murder when he kills an individual *** if, in performing the acts which cause the death, he knows that such acts create a strong probability of death or great bodily harm to that individual." IPI Criminal 4th No. 7.01S.

IPI Criminal 4th No. 7.02S is entitled "Issues in Second Degree Murder When First Degree Murder is Not Charged" and states as follows:

> "To sustain the charge of second degree murder, the State must prove the following propositions:

-15-

*First Proposition*: That the defendant performed the acts which caused the death of [the victim]; and

*Second Proposition*: That when defendant did so,

\* \* \*

he knew that his acts created a strong probability of death or great bodily harm to [the victim].

If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.

If you find from your consideration of all the evidence that any one of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty." IPI Criminal 4th No. 7.02S.

IPI Criminal 4th No. 7.03 is entitled "Definition of Mitigating Factor–Second Degree Murder–Provocation" and provides that

"[a] mitigating factor exists so as to reduce the offense of first degree murder to the lesser offense of second degree murder if, at the time of the killing, the defendant acts under a sudden an intense passion resulting from serious provocation by the deceased. Serious provocation is conduct sufficient to excite an intense passion in a reasonable person." IPI Criminal 4th No. 7.03.

Defendant objected to all three instructions on the same basis that he moved for a directed verdict. He simply maintained that all three instructions were improper because they do not "allege that mitigation has to be shown." He did not argue, however, that IPI Criminal 4th No. 7.03 was improper because there was no evidence to support it and therefore it should not be given at all.

My colleagues in the majority claim that defendant did object to IPI Criminal 4th No. 7.03 at trial, because "he argued that the instruction was improper for the reasons he offered in his directed verdict motion." See slip op. at 8.

Examination of the record shows that defendant did not make a sufficient objection at trial to preserve the issue. The majority chides the State for essentially asking us to tailor the forfeiture rule so as to require a defendant to assert the exact, identical argument at both trial

-16-

and in a posttrial motion in order to preserve the issue. See slip op. at 9. But this is not what the State is asking. Instead it is asking this court to hold defendant to the well-established rule that a defendant must make a *specific* trial objection in order to raise that same issue on review, and that a specific objection to a jury instruction waives all other unspecified grounds. *People v. Cuadrado*, 214 Ill. 2d 79, 89 (2005), citing *People v. O'Neal*, 104 Ill. 2d 399, 407 (1984); see also *People v. Edwards*, 144 Ill. 2d 108, 133 (1991). A defendant forfeits a jury instruction error if the defendant does not raise the instruction issue at trial and does not raise the instruction in a posttrial motion. *People v. Herron*, 215 Ill. 2d 167, 175 (2005). "*Both* a trial objection *and* a written post-trial motion raising the issue are required for alleged errors that could have been raised during trial." (Emphases in original.) *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). There is no support in our case law for the notion proposed by my colleagues that a defendant may simply object to an instruction on a nonmeritorious ground and that such an objection is sufficient to preserve any issue later raised with respect to the instruction.

Here, defendant at the close of the State's case moved for a directed verdict, arguing that the information alleged sudden and intense passion resulting in provocation, thereby introducing motive into the case without any evidence to back it up. Defendant was essentially arguing that the State had failed to prove its case, and therefore the court should direct a verdict on his behalf. The trial court denied the motion to grant a directed verdict for defendant because defendant's premise that the State had to prove the mitigating factor was incorrect. See *People v. Burks*, 189 Ill. App. 3d 782, 784-85 (1989) (neither the State nor defendant has any burden to prove the mitigating factor of provocation in this situation where the provocation element has been conceded). Defendant did not argue that any language in the information itself was inappropriate.[1]

---

[1]Even if defendant had objected to the language of the charging instrument at the time of his motion for a directed verdict, which he did not, defendant's conviction would not be subject to reversal on that basis because defendant suffered no prejudice, as the information apprised defendant of the precise offense charged with sufficient specificity to prepare his defense and allow pleading a resulting conviction as a bar to

-17-

Later, at the jury instruction conference, defendant objected to all three second degree murder instructions (IPI Criminal 4th Nos. 7.01S, 7.02S and 7.03S), by simply arguing that his motion for a directed verdict should have been granted and that none of the instructions "allege that the mitigation has to be shown." This trial objection was again denied because it wrongly posits that the State has the burden to prove provocation and that the instructions must say that the State has this burden. By contrast, in his posttrial motion and on appeal, defendant made the entirely different contention that IPI Criminal 4th Nos. 7.01S and 7.02S *should* have been given, but that IPI Criminal 7.03 *should not* have been given because the provocation issue should not have been submitted to the jury at all. Defendant's specific, nonmeritorious objection at the jury instruction conference waived his later posttrial and appellate argument with respect to the instruction, an argument which was not specified at trial.

The majority's ruling to the contrary erodes the bedrock requirements that *both* a trial and posttrial objection are required to preserve a trial error, and that a specific objection at trial waives all other unspecified grounds that might later be raised with respect to a jury instruction. In doing so, the majority ignores the purpose for requiring a specific trial objection. The reason for the waiver rule is that timely objections to defective instructions permit the court to correct the defects before the instructions are given, and do not therefore permit a party failing to object to gain the advantage of obtaining reversal based on his own failure to act, either intentionally or inadvertently. *People v. Piatkowski*, 225 Ill. 2d 551, 564 (2007); *People v. Roberts*, 75 Ill. 2d 1, 11 (1979); see also *People v. Carlson*, 79 Ill. 2d 564, 577 (1980). By the time defendant raised the specific objection in his posttrial motion that he raised on appeal, IPI Criminal 4th 7.03 had already been given to the jury and the jury had already found defendant guilty. Had defendant objected to the instruction at the jury conference on the specific ground he raised on appeal, the trial court may have decided not to give it, thereby saving the time and expense of empaneling a new jury for a third trial in this case.

---

future prosecutions arising out of the same conduct. *Cuadrado*, 214 Ill. 2d at 86-87 (where a defendant objects to a charging instrument mid-trial he must show this prejudice).

Supreme Court Rule 451(c), however, provides that " 'substantial defects' in criminal jury instructions 'are not waived by failure to make timely objections thereto if the interests of justice require.' " *Herron*, 215 Ill. 2d at 175, quoting 177 Ill. 2d R. 451(c). Rule 451(c) fashions a limited exception to the general waiver rule in order to correct " 'grave errors' and errors in cases 'so factually close that fundamental fairness requires that the jury be properly instructed.' " *Herron*, 215 Ill. 2d at 175, quoting *People v. Hopp*, 209 Ill. 2d 1, 7 (2004). Rule 451(c) is coextensive with the plain-error clause of Supreme Court Rule 615(c), and the two rules are construed identically. *Herron*, 215 Ill. 2d at 175. Rule 615(a) states the following: "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded. Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court." 134 Ill. 2d R. 615(a).

We recently reiterated that the plain-error doctrine allows a reviewing court to consider unpreserved error with respect to a jury instruction only when (1) a clear or obvious error occurs and the evidence is so closely balanced that the error alone threatened to tip the scales against the defendant, regardless of the seriousness of the error, or (2) a clear and obvious error occurs and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the case. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

The error in giving IPI Criminal 4th No. 7.03 was not so serious that it affected the fairness of defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the case. Thus, defendant had the burden on appeal in this case to show that the error was prejudicial–in other words, he must show that the quantum of evidence presented by the State against defendant rendered the evidence "closely balanced." See *People v. Piatkowski*, 225 Ill. 2d at 566.

Defendant has not demonstrated that the evidence presented against him was closely balanced. In fact, it could reasonably be said that the evidence against him was overwhelming, and this is precisely what Justice Schmidt found in his appellate court dissent after reviewing the evidence and concluding that any error was harmless:

"Evidence at trial established a brutal murder with evidence of a struggle. Sutton suffered extensive bruising to her face. Her nose was fractured in two places and the skin between her eyes was torn. She suffered a large, bruised area inside her cheek and lip and one tooth was chipped. A stab wound to the left side of her neck cut her jugular vein and struck her sixth vertebrae. Another stab wound near her collarbone severed the subclavia vein. A third stab wound penetrated her lower chest. A fourth stab wound passed through her liver, stomach, pancreas, and left kidney. She suffered a fifth stab wound to the right side of her back. Two projections of cartilage on the sides of her larynx were fractured. All of this took place during the two-hour period while defendant allegedly slept on the floor below Sutton. Sutton's house was of modest size.

Furthermore, even though defendant denied ever removing his boots or pants at Sutton's home, his toe print was found in Sutton's bathroom. A butcher knife, which had obviously been washed or wiped, was found in a butcher block knife holder in Sutton's kitchen. It was found to contain traces of Sutton's blood. There were no signs of forced entry into the house.

If defendant did not kill Sutton, then someone else entered the house during the two hours that defendant claims he was sleeping, brutally attacked and murdered Sutton, wiped or washed the knife blade, then returned it to the butcher block in the kitchen and exited the house without waking defendant. Somehow defendant's toe print was transferred to the bathroom floor through the sole of the boot that he was wearing. Defendant claims he vomited at the scene and yet police found no evidence of that in searching the house. Sutton's car was also stolen and then later recovered near the last tavern where defendant and Sutton drank together hours before the murder.

Defendant did not call the police when he found Sutton's body, but claims he cannot recall how he got home. He was with his best friend, Scott Reilly, when a news report came on television about the murder. Defendant said nothing.

-20-

There was no evidence of anyone being in the house at the time of the murder except Sutton and defendant. In light of all the evidence, and even excluding defendant's admission of guilt to Scott Reilly, no reasonable jury would vote to acquit." No. 3–04–0816 (Schmidt, J, dissenting) (unpublished order under Supreme Court Rule 23).

Under these circumstances, there can be no doubt that defendant has failed to meet his burden to show that the evidence was closely balanced. I would therefore reverse the judgment of the appellate court and would affirm defendant's conviction and 20-year sentence.