# Illinois Official Reports

## Appellate Court

---

### *People v. Villanueva*, 2017 IL App (3d) 150036

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JOSE RAMON VILLANUEVA, JR., Defendant-Appellant. |
| District & No. | Third District<br>Docket No. 3-15-0036 |
| Filed<br>Rehearing denied | May 30, 2017<br>June 14, 2017 |
| Decision Under Review | Appeal from the Circuit Court of Iroquois County, No. 14-CF-44; the Hon. Gordon L. Lustfeldt, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Michael J. Pelletier and Benjamin J. Wimmer, of State Appellate Defender's Office, of Chicago, for appellant.<br><br>James A. Devine, State's Attorney, of Watseka (Jasmine Morton, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE LYTTON delivered the judgment of the court, with opinion. Presiding Justice Holdridge and Justice O'Brien concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant, Jose Ramon Villanueva, Jr., appeals his convictions for predatory criminal sexual assault of a child, criminal sexual assault, and criminal sexual abuse, arguing (1) the circuit court's comments in front of the jury shifted the burden of proof to defendant and (2) the circuit court should have conducted a *Krankel* inquiry. We affirm.

¶ 2                                    FACTS

¶ 3    Defendant was charged with (1) predatory criminal sexual assault of a child in that he was 17 years of age or older and committed an act of sexual penetration with R.D., who was under 13 years of age, by placing his penis in R.D.'s vagina (720 ILCS 5/11-1.40(a)(1) (West 2014)); (2) criminal sexual assault in that he committed an act of sexual penetration with I.V. in that he placed his penis in I.V.'s vagina through the use of force (720 ILCS 5/11-1.20(a)(1) (West 2014)); and (3) criminal sexual abuse in that he committed an act of sexual conduct with I.V. in that he forced I.V. to touch his penis for the purpose of his sexual arousal (720 ILCS 5/11-1.50(a)(1) (West 2014)).

¶ 4    The case proceeded to a jury trial. The court asked the jurors if they understood that: "The defendant's presumed innocent of the charges. That before he can be convicted he must be proven guilty beyond a reasonable doubt. The defendant is not required to offer any evidence on his or her behalf. And if the defendant does not testify you can't hold it against him." Each of the jurors agreed that they understood.

¶ 5    I.V. was 23 years old at the time of trial and testified that, when she was 5 years old, she and her three siblings, including George D.[1] and Selena D., moved in with their grandparents, Rosa and Jose Villanueva, Sr., and their uncles, Robert and defendant. Shortly after I.V. and her siblings moved in, their four cousins, including R.D., also moved in. In sum, Rosa, Jose Sr., Robert, defendant, and the eight children all lived in the house. The house had two floors. The second floor contained three bedrooms: defendant had one bedroom; the boys, including George, shared one bedroom; and there was a spare bedroom. On the first floor, I.V., Selena, and R.D. slept in the dining room; Rosa and Jose Sr. had a room; and Robert slept in the living room. According to I.V., Rosa, Jose Sr., and Robert could not go upstairs because of health issues. I.V. said the house was in defendant's name and he was responsible for disciplining the children. Four years prior to trial, defendant moved out of the house and moved in with his girlfriend. For purposes of clarity, we will refer to the house defendant owned that the children lived in as the family house and the house he moved in with his girlfriend as the second house.

¶ 6    I.V. testified that defendant would hit the children. She occasionally had to miss school due to having a black eye or other injuries. Throughout her entire school experience, I.V. was in special education classes because she had a disability that affected her memory. She was not good with numbers and dates because of her disability. She moved out of the family house when she was 19 years old after getting married.

¶ 7    I.V. testified that when she was about eight years old, she was disciplined by defendant because she "couldn't read the book and he kept hitting [her]. [She] was crying." Defendant

_____

[1]George's real name is Jorge, however, he is referred to as "George" throughout the record. Therefore, for consistency, we will refer to him as George.

told I.V. to go upstairs. They went into his bedroom, and defendant locked the door. There was a door that led to another bedroom, which defendant also locked. Defendant had a television with a DVD player. Defendant played a pornography DVD. While they were viewing the pornography, defendant masturbated. He did this on multiple occasions. On other occasions, defendant forced I.V. to touch his penis and perform oral sex.

¶ 8 When I.V. turned 14 years old, defendant began forcing I.V. to have sexual intercourse with him. This would happen in defendant's room with pornography playing. Defendant would make excuses to call I.V. upstairs, stating that she needed to fold his laundry or clean his room. This went on until I.V. was 19 years old and left the family house. Afterwards, defendant would tell I.V. not to tell anyone.

¶ 9 I.V. stated that the first time they had sexual intercourse, George saw them. He was in the bedroom next door and saw them through a crack at the top of the door. Later, at a family meeting, George told everyone what he saw, and I.V. confirmed that it was true. At the meeting, defendant was asked if the allegations were true, and he denied it. I.V. said that defendant's denial "made [her] look stupid."

¶ 10 I.V. testified that the abuse also occurred in the garage. Defendant was the only person who had a key or a garage door opener, even after he moved out. After defendant moved into the second house, he would stay in the garage when he fought with his girlfriend. There was a couch and a makeshift bed in the garage. When defendant was in the garage, he would tell I.V. to come into the garage. Defendant forced I.V. to have sexual intercourse and perform oral sex on him. I.V. said the abuse also occurred at the second house. She sometimes missed school to babysit defendant's child and his stepdaughter's child. Defendant was present while she was babysitting, and they would have sexual intercourse.

¶ 11 Defendant taught I.V. to drive when she got her permit. During these driving lessons, defendant would force I.V. to perform oral sex on him. They also had sexual intercourse in the backseat. Selena and R.D. came on one of these driving lessons, but defendant said they were "disturbing [I.V.'s] driving" so they were not allowed to come again. Because of her disability, I.V. did not remember specific dates of the abuse.

¶ 12 Selena and R.D. both were kicked out of the family house in the year prior to trial. I.V. agreed that she never went to the police until R.D. was kicked out of the family house. She said, "I kept to myself because no one believed me especially my own flesh and blood, my family." She stated it did not "have [anything] to do" with R.D. being kicked out.

¶ 13 R.D. testified that she was four years old when she went to live at the family house. She said the children basically took care of themselves. She also stated that defendant was mean and used physical violence as a form of discipline.

¶ 14 R.D. testified that in 2006 "[defendant] raped [her]." She said that defendant would tell her she was in trouble and make her go upstairs to his bedroom. He would lock the door and "tell [her] close your eyes and put his penis in [her] mouth and stuff like that and make [her] do stuff that [she] didn't want to do." Defendant would also lock the door that led to another bedroom, though the door had a crack at the top. He would force R.D. to have sexual intercourse. R.D. said this happened approximately four or five times over the period of a year when she was eight or nine. R.D. said, at one point, "[Defendant] tried to do it again, but I put my foot down and I didn't let him do it ever again." After that, she told Robert, Rosa, and Jose Sr. what defendant was doing. Defendant denied doing anything, and Robert, Rosa, and Jose Sr. believed defendant. I.V. was present when R.D. told her family what had happened. I.V. had

disclosed her abuse by defendant on an earlier date. R.D. said the family "kind of did believe" I.V. because George had seen I.V. and defendant having sexual intercourse, but that they "ended up being on [defendant's] side." R.D. testified that defendant would watch VHS tapes of pornography in his bedroom all the time.

¶ 15        R.D. said she got kicked out of the family house because she got into an argument with Robert. He had kicked her out on numerous occasions, but would always tell her to come back. At the time she got kicked out of the family house, R.D. and Selena were the only children still living there. R.D. said defendant did not have anything to do with her getting kicked out of the family house.

¶ 16        Once R.D. got kicked out of the family house, she told the police what happened. She did not go to the police earlier because she was scared, as she was still living in the family house. She said, "[Selena] told me it was the right thing to do and she was going to be on my side throughout the whole thing." When asked if she was getting back at her family because she was asked to leave, R.D. said she was not getting back at them because she wanted to leave the family house. Once she left, she said she was finally "strong enough" to tell the police when she was not before.

¶ 17        R.D. said she and Selena were present once when defendant was teaching I.V. to drive, but, even though they were not talking, defendant told them they could not come again because they were distracting I.V. R.D. stated that he always had "eyes on [I.V.]"

¶ 18        Selena testified that defendant had a DVD/VCR player in his bedroom. Once defendant moved out, they cleaned his room and found lots of pictures of I.V. in his closet. Selena remembered that at a family meeting, I.V. told everyone what defendant was doing to her and no one believed her. At this meeting, George told the family that he saw defendant assaulting I.V., but the family did not believe him. Later, a similar meeting occurred regarding R.D. Selena further stated that she had once gone with I.V. when she was learning to drive, but defendant got mad. Selena said she was kicked out of the family house because she was accused of calling to report that Robert and Rosa were committing elder abuse. She said she was not unhappy about being kicked out, as she was going move in with her boyfriend anyway.

¶ 19        Sergeant Eric Starkey testified that he had been employed with the Iroquois County sheriff's department for approximately 10 years. He investigated the allegations of sexual abuse by I.V. and R.D. against defendant. He interviewed defendant. Defendant initially told Starkey he had never been alone with any of the children and had never taught I.V. how to drive. Defendant further stated that he did not have any pornography in the family house and denied physically or sexually abusing the girls.

¶ 20        After speaking with some of the other family members, Starkey interviewed defendant a second time. Through his other interviews, inconsistencies developed regarding whether defendant had been alone with any of the children, had pornography, and had taught I.V. to drive. Starkey stated that defendant gave him no concrete answers about any of the inconsistencies, but simply acknowledged that there may have been inconsistencies. Defendant answered Starkey very vaguely, but ultimately agreed that he might have been alone with the children sometime during the long period that they lived there.

¶ 21        Nathan Gavel testified that he is a child protection advanced specialist with the Department of Children and Family Services as an investigator. Gavel interviewed Rosa and Robert. Rosa indicated that she did not know of any abuse going on in the family house. Gavel said that Robert mentioned the girls had been upstairs, but said he did not know what went on upstairs

since he could not walk up the stairs. Robert told Gavel that he and defendant would discipline the children, and Robert knew they had been disciplined upstairs, as he saw them at the top of the stairs.

¶ 22        After the State rested, the defense called Jennifer Corona Gomez, who testified that she was defendant's stepdaughter and lived with her mother and defendant at the second house. She was I.V.'s age and went to school with her. She testified that I.V. would come over "[v]ery rarely." When she did come over, it was to babysit Gomez's brother or for driving lessons. I.V. never told Gomez that she was abused by defendant. Gomez agreed that if defendant and her mother had an argument, defendant would stay in the garage at the family house.

¶ 23        George D. testified that he never observed any sexual activity between defendant and any of the girls. He further stated that there were never any family meetings about any reports by any of the girls of sexual activity with defendant. None of the girls ever told him they were abused by defendant.

¶ 24        Robert testified that defendant's room did not have a VCR. The door between defendant's bedroom and the other bedroom was nailed shut and there were no cracks. Robert did not remember any of the girls complaining to the family that defendant had abused them. George did not say anything to him either. Robert said R.D. left the family house on her own accord. Robert further stated that defendant took I.V. driving a couple of times. Robert said I.V. never went to the second house to babysit or for any other reason. Selena was the only person who had gone to the second house. He did not know whether the girls were ever upstairs alone. Defendant occasionally would stay in the garage if he and his girlfriend had an argument.

¶ 25        Rosa testified that the girls never went upstairs. Rosa said that Gomez was always with I.V. when defendant was teaching her to drive. The girls never told her they had been abused by defendant, nor was there ever a family meeting where they said they were abused. George never said anything about any of the girls being abused. Rosa stated that R.D. was not kicked out of the family house but that she voluntarily moved out. I.V. moved out to live with her boyfriend. Neither R.D. nor I.V. moved out because they were mad at anyone. They did kick Selena out of the family house because she fought with Rosa every day. Selena was upset over being kicked out of the family house. She never noticed any of the children going into the garage. Rosa was the one who disciplined the children; defendant was never involved. When defendant slept in the garage after a fight with his girlfriend, he slept in his car.

¶ 26        Defendant testified that he did not sexually assault any of the girls. He said they said those things about him because they were mad at him because he "did not approve of [Selena's] boyfriend moving into the [family] house." Robert contacted defendant and told him that Selena and R.D. were causing problems. Defendant said he went to go kick Selena and R.D. out, but R.D. was already gone. Defendant started to testify as to something Selena had said, but the State objected stating, "Now he wants to talk about what Selena said. [R.D.] is already gone, your Honor." The following then occurred:

> "[ASSISTANT STATE'S ATTORNEY]: My objection is now he wants to introduce what Selena said and I don't know how that's going to explain—
>
> [DEFENSE COUNSEL]: Well, we will tie it up. We will ask him to explain.
>
> THE COURT: Well, only thing is if it doesn't get tied up then it's laying out there. It goes I think maybe, I don't know, to bias of the witness. Is that where we are going?
>
> [DEFENSE COUNSEL]: Partially.

THE COURT: Well, what's the other part of it?

[DEFENSE COUNSEL]: We are suggesting that these charges are [the] result of a conspiracy between the 3 of them.

THE COURT: Well, suggesting and proving are 2 different things. Conspiracy means that the 3 of them had to get together and make an agreement and I don't know how he would know that unless they made an agreement in front of him, which is pretty stupid in my book, but I will let you ask about things that go to bias of Selena because she has testified. I will go that far."

Defendant then said, "[Selena] made a remark upon leaving and threw my keys on the ground says you and Robert are going to be sorry you did this." Defendant said, "the next two weeks there was nothing but 911 calls that [R.D.] and Selena [D.] wanted their property." He believed I.V. would also make these accusations because she was mad at defendant for kicking Selena out of the family house.

¶ 27    During closing arguments, the State said:

"You know, one thing that you can take from this from the defense witnesses not a single one of them called [I.V.] or [R.D.] a liar. *** [N]ot one single witness from the defense said those 2 are lying. They've got something that they are lying about and they are framing [defendant]. Not a single utterance was made that they are making this up. This is some fanciful story. Not a single one. Even grandma Rosa said the girls sometimes lied to get out of trouble. She never said that. Their ability to tell the truth was never questioned. When they had an opportunity to do so it didn't happen. That adds to the credibility of what [R.D.] and [I.V.] were saying."

¶ 28    In its closing argument, defense counsel stated the State has the burden of proving defendant guilty beyond a reasonable doubt. Defense counsel then stated:

"We have the police officers here, okay. Remember Officer Marcotte up there? He did his report. He talked to the girls. I asked him about that. He did a report and I quoted these girls, I quoted [R.D.], I think she denied and then it was confirmed by Officer Marcotte. Officer Marcotte said in his report he asked both Selena and both [R.D.] if [defendant] attempted sexual assault of either one of them. Officer Marcotte remembered the girls Selena and [R.D.] looking at each other before they—."

The following exchange then occurred:

"[ASSISTANT STATE'S ATTORNEY]: I am going to object to that. He just read from a report that's not in evidence.

THE COURT: Officer Marcotte never testified.

[ASSISTANT STATE'S ATTORNEY]: Right.

THE COURT: Did you mean Mr. Starkey?

[ASSISTANT STATE'S ATTORNEY]: I move to strike all of that, judge. That's not in evidence, never been talked about.

[DEFENSE COUNSEL]: Didn't we have that testimony from Officer Marcotte, judge?

THE COURT: He didn't testify.

[ASSISTANT STATE'S ATTORNEY]: He didn't testify.

[DEFENSE COUNSEL]: I will withdraw that."

The court then directed the jury to disregard that.

After closing arguments, the court directed the jury on the law. The court stated:

> "From time to time it's been the duty of the court to rule on the admissibility of evidence. You should not concern yourselves with the reasons for these rulings. ***
>
> *** Neither by these instructions nor by any ruling or remark which I have made do I mean to indicate any opinion as to the facts or as to what your verdict ought to be."

The court further instructed the jury:

> "The defendant is presumed to be innocent of the charges against him. This presumption remains with him throughout every stage of the trial and during your deliberations of the verdict and is not overcome unless from all the evidence in this case you are convinced beyond a reasonable doubt that he's guilty.
>
> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt and this burden remains on the State throughout the case. The defendant is not required to prove his innocence."

The jury found defendant guilty of all counts.

Prior to sentencing, defendant sent a *pro se* document to court "for a possible Miss Trial [*sic*]." In the document, defendant stated, *inter alia*:

> "I was shocked that you did not allowed a statement from Officer Chief Curt Marcotte of in evidence was written by him that both alleged/victims were, 'looking at each other in the eyes when statement was being reported.' That is in evidence and Mr. Marcotte police report is the whole reason this all started til this day."

The presentence investigation (PSI) report included a section entitled "Offender's Written Version of Offense." In that section, defendant again wrote Marcotte's "police report was not allowed in jury trial when it is in evidence and in my disclosure that started all this investigation." Defendant was sentenced to consecutive terms of 10, 6, and 2 years in prison on the respective counts.

## ANALYSIS

### I. The Circuit Court's Comment

Defendant argues that the court "improperly shifted the burden of proof to the defense by stating, in the presence of the jury":

> "Well, suggesting and proving [a conspiracy] are 2 different things. Conspiracy means that the 3 of them had to get together and make an agreement and I don't know how he would know that unless they made an agreement in front of him, which is pretty stupid in my book ***."

Specifically, defendant argues that this comment, which was "effectively [a jury] instruction," "misstated the law" in two ways: the court (1) "indicated that [defendant] bore the burden of proving his theory of defense"; and (2) "went on to suggest that the required proof of the defense case was impossible absent direct evidence of an explicit agreement among the State's witnesses to falsely accuse [defendant]." Defendant admits that the alleged errors are forfeited, as he neither objected to the comment at trial nor did he file a posttrial motion, but asks us to consider his argument under both prongs of the plain-error doctrine. We do not believe the court's comment shifted the burden of proof to defendant. However, we do agree the comment

misstated the law as far as the evidence necessary to prove a conspiracy. Nonetheless, we do not find that the misstatement of law rises to the level of plain error, as the evidence was not closely balanced and, when considering the totality of the circumstances, the error did not confuse the jury.

¶ 34 Defendant first argues that the court's comment indicated that defendant bore the burden of proving his defense. It is manifest that the State carries the burden of proving each element of a charged offense beyond a reasonable doubt. *E.g.*, *People v. Brown*, 2013 IL 114196, ¶ 52. Such burden rests on the State throughout the entire trial and never shifts to the defendant. *People v. Howery*, 178 Ill. 2d 1, 32 (1997). "The defendant is presumed innocent throughout the course of the trial and does not have to prove his innocence, testify, or present any evidence." *People v. Cameron*, 2012 IL App (3d) 110020, ¶ 27.

¶ 35 Defendant points to the court's comment that "suggesting and proving are 2 different things," and argues that this, coupled with the "instruction" about proof in conspiracy, shifted the burden of proof to defendant. Reviewing the record in its entirety, we cannot say that this isolated comment shifted the burden to defendant. The court did not make the comment to the jury, but to counsel. Though the comment was made in the presence of the jury, it did not amount to an instruction, and the court instructed the jury to disregard any remarks it made while ruling on the admissibility of evidence. When selecting the jury, the court specifically asked each juror whether he or she understood that defendant was presumed innocent, must be proved guilty beyond a reasonable doubt, and was not required to offer any evidence on his behalf. After the comment by the court regarding conspiracy was made, defense counsel told the jury again, during closing arguments, that the burden of proof was on the State. Upon the trial's conclusion, the court instructed the jury that defendant did not have to prove his innocence and that the burden of proof was with the State throughout the entire case. Viewing the court's comment in context, the record shows that the comment did not act to shift the burden of proof to defendant, nor could it be interpreted as such by the jury. The lack of error precludes our need to consider plain error. See *People v. Walker*, 232 Ill. 2d 113, 124-25 (2009).

¶ 36 In coming to this conclusion, we reject defendant's framing of the comment as an instruction. Every case that defendant cites considers actual jury instructions that the court directed at the jury. See *People v. Pollock*, 202 Ill. 2d 189, 212 (2002); *People v. Mohr*, 228 Ill. 2d 53, 66-67 (2008); *People v. Messenger*, 2015 IL App (3d) 130581, ¶ 44; *People v. Murray*, 364 Ill. App. 3d 999, 1006-07 (2006); *People v. Williams*, 181 Ill. 2d 297, 319 (1998); *People v. Mendez*, 2013 IL App (4th) 110107, ¶ 33. As stated above, the comment the court made was not a jury instruction. See *supra* ¶ 35. In fact, it was not even directed to the jury. Defendant's cited case law is not applicable.

¶ 37 We now turn to defendant's second argument with regard to the court's comment. Specifically, defendant argues that the court misstated the law of conspiracy. The court stated: "Conspiracy means that the 3 of them [I.V., R.D., and Selena] had to get together and make an agreement and I don't know how he would know that unless they made an agreement in front of him ***." The court's comment suggested that conspiracy could only be shown by direct evidence of the agreement testified to by the witness. However, conspiracy can be, and often is, proved by circumstantial evidence. *People v. Morgason*, 311 Ill. App. 3d 1005, 1013 (2000) ("Direct evidence of an agreement is not necessary for a conspiracy conviction, since agreement between coconspirators may be inferred from their concerted acts towards a

common goal."). As the court's comment misstated the law regarding conspiracy, we find the comment amounted to error.

¶ 38    As we have determined that the court's comment was error, we next turn to the question of whether it rises to the level of plain error.

"We will apply the plain-error doctrine when: '(1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence.' " *People v. Thompson*, 238 Ill. 2d 598, 613 (2010) (quoting *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007)).

Defendant asks us to consider the error under both prongs of plain error.

¶ 39    First, the evidence was not closely balanced. "[I]n making a determination of whether the evidence is closely balanced, a reviewing court must make a commonsense assessment of the evidence within the context of the circumstances of the individual case." *People v. Belknap*, 2014 IL 117094, ¶ 52.

¶ 40    I.V., R.D., and Selena all testified as to defendant's abuse of I.V. and R.D. All three were consistent as to the fact that defendant sexually abused and sexually assaulted I.V. and R.D. Defendant even admits that "there was nothing inherently incredible" about their accounts as "their inability to remember the precise time or frequency of events would not have been unusual, given both the passage of time and I.V.'s evident handicap." Further, factual portions of their stories—such as the driving lessons, defendant's discipline of the children, the girls going upstairs, and defendant staying in the garage—were corroborated by some of defendant's own witnesses. While defendant denied that this abuse occurred, Starkey and Gavel testified to the inconsistent statements defendant made regarding his access to the children and pornography. Gavel further testified to inconsistencies in other defense witnesses' testimonies regarding whether the girls had ever been upstairs.

¶ 41    We reject defendant's argument that "the unusual timing and circumstances of their contact with authorities raises suspicions." Defendant points to the fact that I.V. and R.D. went to the police at the same time after R.D. and Selena were no longer living in the family house. R.D. explained that she was afraid to go to the police while living in the family house. Both I.V. and R.D. testified that they were afraid to go to the police, since none of their family believed them, but that Selena gave them the strength to report what had happened. Further, Rosa stated that neither I.V. nor R.D. were mad at anyone when they left the family house. I.V. moved out on her own when she got married, and R.D. had been ready to move out. Serena was the only one upset, and she did not make the allegations. After "[v]iewing the evidence in a commonsense manner in the context of the totality of the circumstances," we do not believe that the evidence was closely balanced. *Id.* ¶ 62.

¶ 42    As to the alternative plain error prong, we find the error was not "so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process." We note that the word "conspiracy" was only mentioned in this exchange between the court and counsel and was not directed at the jury. Defense counsel did not mention a "conspiracy" in his opening or closing arguments, nor did any of the witnesses use the word. The one incorrect comment made by the court to counsel, here, is not "sufficient to confuse the jury and cause it

to ignore the clear instructions given to it by the court as to the proper course of its deliberations." See *People v. Glasper*, 234 Ill. 2d 173, 214 (2009).

¶ 43    Because defendant cannot establish that the evidence was closely balanced or that the error was so serious that it affected the trial, we decline to apply the plain-error exception to forfeiture.

¶ 44                                    II. *Krankel* Inquiry

¶ 45    Defendant contends that the circuit court erred in failing to conduct a *Krankel* inquiry. Because defendant's letter to the court did not express a clear claim of ineffective assistance of counsel, we find the court was not required to *sua sponte* conduct a *Krankel* inquiry.

¶ 46    *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny have developed the procedure for handling claims of ineffective assistance of counsel at the circuit court level. The process for hearing those claims contains two steps: (1) the circuit court makes a preliminary inquiry to examine the factual basis of the claim; and (2) if the allegations show "possible neglect of the case," new counsel is appointed to represent the defendant in a full hearing on the claims. *People v. Moore*, 207 Ill. 2d 68, 78 (2003).

¶ 47    During the pendency of this appeal, after the parties submitted their briefs, the Illinois Supreme Court determined what was necessary to trigger a *Krankel* inquiry. See *People v. Ayres*, 2017 IL 120071. After sentencing, the defendant in *Ayres* filed a *pro se* petition to withdraw guilty plea and vacate sentence. *Id.* ¶ 6. In the petition, the defendant alleged " 'ineffective assistance of counsel.' " *Id.* He did not include any explanation or facts to support his claim. *Id.* ¶ 7. The appellate court found that "the four words 'ineffective assistance of counsel' without explanation or any supporting facts were insufficient to trigger the circuit court's duty to inquire." *Id.* On appeal, the supreme court noted the conflict among the appellate court districts "as to what is sufficient to trigger a *Krankel* inquiry." *Id.* ¶ 18. The court held that "when a defendant brings a clear claim asserting ineffective assistance of counsel, either orally or in writing, this is sufficient to trigger the trial court's duty to conduct a *Krankel* inquiry." *Id.*

¶ 48    Further, in *People v. Taylor*, 237 Ill. 2d 68, 77 (2010), the Illinois Supreme Court considered whether the defendant had "demonstrate[d] a 'clear basis' for [an] allegation of ineffective assistance of counsel" where the defendant stated at sentencing that he would have taken a plea deal if he had known he "was facing this type of situation." *Id.* at 73. The defendant argued that his statement implied that counsel was ineffective for failing to advise him about the possible penalties if he rejected the plea offer. *Id.* at 75. The court noted that "nowhere in defendant's statement at sentencing did he specifically complain about his attorney's performance, or expressly state he was claiming ineffective assistance of counsel." *Id.* at 76. The supreme court found the defendant's statements to be insufficient to warrant a *Krankel* inquiry, noting, "[i]f defendant's statement in the case at bar were deemed sufficient to require a *Krankel* inquiry, few statements would be insufficient." *Id.* at 77.

¶ 49    Here, defendant sent a document to the court after trial, stating that he was "shocked" the court did not allow in evidence from Marcotte. In the PSI report, defendant also said Marcotte's police report was not allowed into evidence. Nowhere in either statement did defendant even mention his attorney. Therefore, these statements did not assert a clear claim of ineffective assistance of counsel as to warrant a *Krankel* inquiry. *Ayres*, 2017 IL 120071, ¶ 18.

¶ 50    Alternatively, defendant argues that the court should have *sua sponte* conducted a *Krankel* inquiry after defense counsel, during closing arguments, appeared to believe Marcotte had testified. Though the circuit court has a duty to follow the *Krankel* procedure to consider posttrial claims of ineffective assistance of counsel, it is only required to do so when defendant raises the claim. See, *e.g.*, *id.* ¶ 11; *People v. Jolly*, 2014 IL 117142, ¶ 29; *People v. Patrick*, 2011 IL 111666, ¶ 41. The circuit court is not required to *sua sponte* conduct a *Krankel* inquiry without a claim of ineffective assistance of counsel from defendant, which, as stated above, defendant did not do here.

¶ 51                                    CONCLUSION
¶ 52    The judgment of the circuit court of Iroquois County is affirmed.

¶ 53    Affirmed.