Filed 11/23/10       NO. 4-10-0203

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| In re: CHARLES K., a Person Found Subject to Involuntary Admission, | ) ) | Appeal from Circuit Court of |
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Macon County |
| Petitioner-Appellee, | ) | No. 10MH27 |
| v. | ) | |
| CHARLES K., | ) | Honorable |
| Respondent-Appellant. | ) ) | Lisa Holder White, Judge Presiding. |

JUSTICE APPLETON delivered the opinion of the court:

In February 2010, a petition was filed for the emergency involuntary admission of respondent, Charles K., alleging he was mentally ill, reasonably expected to inflict serious physical harm upon himself or others, and unable to provide for his basic physical needs. The trial court conducted a jury trial and, upon the jury's verdict finding respondent was a person subject to involuntary admission, ordered respondent hospitalized for no more than 90 days. On appeal, respondent claims the order must be reversed because the jury was not instructed that the State was required to prove by clear and convincing evidence that he was mentally ill. We affirm.

I. BACKGROUND

On February 4, 2010, Decatur police officer T. Tool filed a petition for emergency involuntary admission as to respondent pursuant to section 3-601 of the Mental Health and Developmental Disabilities Code (Code) (405 ILCS 5/3-601 (West 2008)). In his factual basis, Tool stated respondent was found at the Holiday Inn in Decatur after

police were called because respondent was "barking at patrons who were entering and exiting" the hotel. Tool spoke with respondent, "who was making no sense and stated 'they are watching me.'" Tool asked respondent who was watching him and respondent "would change the subject[,] again making no sense as he communicated."

The petition alleged respondent was (1) mentally ill, (2) reasonably expected to inflict serious physical harm upon himself or another in the near future, (3) unable to provide for his basic physical needs so as to guard himself from serious harm without the assistance of family or outside help, and (4) in need of immediate hospitalization for the prevention of such harm. Two medical certificates were also filed indicating respondent was subject to involuntary admission and in need of immediate hospitalization.

Respondent elected to have his petition heard by a jury, and on February 16, 2010, the trial court conducted respondent's jury trial. Outside the presence of the jury, the State introduced two exhibits. Exhibit No. 1 was a comprehensive examination and social investigation report and treatment plan, which indicated that respondent had "multiple past psychiatric hospitalizations for mental illness" and he was uncooperative with treatment. Exhibit No. 2 was a typed one-page document identifying the "Appropriateness and Availability of Alternative Treatment Settings," "Proposed Treatment Methods," and "Timetable for Achievement of Treatment Goals." According to this exhibit, respondent's refusal to take his medication had "consistently been an issue for him and the major reason for his hospitalizations." His refusal, coupled with his resulting aggressive behavior, made placement at his home or in a nursing home "impractical." It was recommended that respondent be hospitalized at Andrew McFarland Mental Health Center

(McFarland). The exhibit further indicated that medication was the "essential" treatment for controlling respondent's symptoms, but he would also be urged to participate in other means of treatment such as individual, group, occupational, and recreational therapies. Finally, "[g]iven the severity and chronicity of [respondent]'s condition[,] as well as his history of noncompliance, a minimum of three months--and probably much longer--of inpatient treatment will probably be required in order to have any real impact on his functioning." Our review of the record indicates that the jury was never presented with, or even aware of, these exhibits.

After the trial court admitted these exhibits into evidence, the court summoned the jury, and the State presented the following testimony. Dr. Rohi Patil testified he had worked as a psychiatrist at St. Mary's Hospital for 34 years. Based on his examination of respondent, Dr. Patil diagnosed him with paranoid schizophrenia and opined that respondent was experiencing "severe" psychotic episodes. Respondent was "very psychotic," hostile, and angry. Dr. Patil described respondent's behavior and statements as "bizarre." For example, Dr. Patil told respondent he did not understand what respondent was saying, and respondent replied that only the Central Intelligence Agency (CIA) could understand him. Dr. Patil said he had examined respondent every day since his admission, and respondent remained paranoid and delusional and had refused his medications. In Dr. Patil's opinion, respondent was unable to care for himself in his current mental state.

Dr. Patil testified that he had reviewed respondent's mental-health records and discovered that respondent had suffered from paranoid schizophrenia for "a number

-3-

of years." Respondent was most recently hospitalized for treatment for six months last year at McFarland in Springfield. According to Dr. Patil, respondent's current prognosis with treatment was good, but without treatment, it was "poor." Without treatment, there was "a high likelihood" that respondent "may hurt somebody." Dr. Patil recommended that respondent be treated at McFarland in order to "protect him and protect other people."

On cross-examination, Dr. Patil described respondent as follows: "He's a very sick gentleman, really sick. Needing the help. Has no insight into his problems."

Shelly Perry, a registered nurse at St. Mary's, testified next for the State. She described respondent as "threatening [and] aggressive." She described a recent incident where she had knocked on respondent's door, announcing that she had his oral medication. Respondent jumped out of bed, "was in [her] face in a very intimidating manner[,]" and threatened her with violence if she did not leave. She left respondent's room, but he chased after her to the nurses' station. Perry said respondent was frequently very agitated and intimidating and has invaded her "personal space." On another occasion, four or five days after the first incident, Perry said she had to request the services of hospital security due to respondent's threatening, intimidating and impulsive behavior. He had approached the nurses' station, asking to leave the unit. When his request was denied, he initially became agitated, but his behavior escalated until he threatened to assault the staff. Security had to physically restrain respondent until the staff could inject him with a sedative. Perry said respondent has told her that he was "the Archbishop to the Pope" and a CIA agent.

Perry also testified that respondent was not taking care of his personal hygiene on his own. She said the staff had to order him to take a shower, brush his teeth,

and comb his hair. Perry had observed respondent threaten other nurses and behave in what Perry described as a sexually inappropriate manner with other staff members. Respondent was in a housekeeper's "personal space, kind of looming over her" when he asked her for her telephone number. According to Perry, the housekeeper felt uncomfortable. Perry redirected respondent without incident, informing him he was acting inappropriately. Perry said on every shift she worked, she observed respondent "looming over" people, entering into their personal space. He was not always redirected easily. In those two or three instances where they were unable to redirect him, the staff would use the gathering of "silent speed teams" or a "show of force," which indicated to respondent that he was outnumbered.

Laterrika Bradford, a front-desk employee at the Decatur Holiday Inn, testified that respondent was a guest at the hotel on February 3, 2010. During Bradford's 3 p.m. to 11 p.m. shift, she saw respondent in the lobby. He approached her at the front desk and said something to her, but Bradford did not understand what he was saying. She shook her head and he walked away. She saw respondent approach a male guest who was walking through the lobby. Respondent grabbed the man's arm. Bradford said the man looked afraid, but walked away from respondent. Respondent approached Bradford at the front desk multiple times. Each time he began approaching, Bradford picked up the telephone and simulated a conversation. Bradford said respondent was scaring her. Each time respondent saw Bradford on the telephone, he would approach someone else in the lobby. Bradford estimated that respondent approached approximately 20 different people. She also saw respondent talking to a wall, but she could not understand anything he said.

One guest told Bradford that he did not feel comfortable at the hotel with respondent there. Another guest told respondent to go to his room, but he ignored her, so she called the police. When the police arrived, respondent refused to go to his room and was generally uncooperative with their requests.

Bradford said respondent did not make any aggressive gestures toward her or the other guests, but she was still afraid of him due to his odd behavior. She admitted that in terms of physical contact, respondent did nothing more than grab another person's arm and try to initiate a conversation.

Stephen J. Rathnow, a licensed clinical professional counselor, testified that he worked at St. Mary's with the involuntarily admitted patients. Rathnow had difficulty speaking with respondent because respondent would either refuse to talk to him or would mutter, ramble, or speak unintelligibly. Rathnow had not seen respondent become aggressive but had seen him talking and arguing with himself in the hallway. He would frequently shake his finger at the wall, which Rathnow described as a response to internal stimuli, such as auditory or visual hallucinations--symptoms that individuals with a "serious mental illness" often experience. He said initially, respondent refused to shower, but lately he had complied when directed. However, respondent continued to be noncompliant with his treatment. In Rathnow's opinion, if respondent did not remain hospitalized, his prognosis was "[v]ery poor" and his condition would deteriorate, resulting in activity that would put himself and others at "great risk."

Robert K., respondent's brother, testified next for the State. Robert said respondent has had mental-health issues for "quite a few years." After respondent's

hospitalization at St. Mary's, Robert visited respondent's home and described it as follows:

"A water hose was stuck in a washing machine in the basement. It flooded out his basement. His stove in the kitchen was burnt black. They had to take it out and put it in the back yard. It's a wonder he didn't burn the house down. His wiring, he's got the plates off the wall, and the wire's sticking out, and the receptacle is sticking out. There's water dripping from the *** first floor ceiling in the kitchen down in onto the floor and on the walls. Scum on the walls. He threw his clothes out in the street. He threw his clothes in the front yard. He threw his clothes on the roof.

\*\*\*

Electricity right now is shut off. They're trying to get it on so they can clean his walls and everything and get it straightened up for him."

Robert testified that respondent had been hospitalized at McFarland twice and once at a facility in Elgin. He said when respondent took his medication, he was fine. When he refused to take his medication, "he gets in trouble." Robert said respondent "needs help" and needs to be hospitalized.

Robert said he and his family tried to watch over respondent at home. Their mother could see respondent's house from her house, and Robert's daughter and son-in-law stopped by regularly to check on him. He said respondent's home was usually in

disarray, but since his hospitalization, it had been condemned by the fire department. Robert's children were working on the house to get it liveable again.

At the conclusion of Robert's testimony, the State rested. The trial court continued the trial until the next day. On February 17, 2010, the trial resumed with respondent testifying on his own behalf. He said, before staying at the Holiday Inn in Decatur for two days, he lived in his own home in Lincoln. He explained in detail, but in rambling fashion, the electrical and plumbing problems at his home. When asked about his stove, respondent explained that he had unplugged the "self-starter" and the pilot light "melted," starting a fire. He said the blackness observed on the stove was the "fire extinguishing material."

Respondent said he met a "very good friend" and "business people" at the Holiday Inn. He said he might have grabbed them by the arm to shake their hand in an attempt to be "real friendly and courteous." The following exchange occurred:

"Q. So, everybody you talked to at the hotel, did you know them?

A. Pretty much or knew where they were from because I could tell by their language. I speak many languages. Also--(inaudible)--that's beside the point.

Q. Okay.

A. (Unintelligible utterance) (Unintelligible utterance)

Q. Now, with regards to you're being brought into the hospital, there was testimony with regards to interaction that

you had with the doctor.

A. Interaction with the doctor?

Q. Dr. Patil. You know?

A. Like you had just then? Interaction. What would you say, I should continue or leave? Such as a gesture I used.

Q. Okay.

A. Not warding him off or anything. Speaking good.

Q. Were you--uh--willing--did you willingly go to St. Mary's?

A. No, I did not. As a matter of fact, the officers were there, and someone had called an ambulance in the meanwhile. The officers were merely very, very ready, I feel, to just fuse the factor. They had my records, my license, all my material. I didn't read it. Debit card. Whole nine yards. They knew I was able to take care of myself. So, the--uh--attendants came. They started questioning me such as, 'Do you know red?' You know, the old saying, red fire engine, white, whatever they call it. Psychology tests. They'd ask me the same questions back and forth between the two. I said, [']well, they're watching me too closely. Can't answer.['] You know, I--I just don't answer."

Respondent continued with a rambling narrative of his ride in the ambulance to the hospital. Respondent explained that, once he arrived at the hospital, the staff "demanded

-9-

[he] take a shot. The shot they g[a]ve [him] was with one of these apparatus like--uh--transfusions. You never give a shot like that. What it was, probably sodium. After [he] c[a]me to, [he] blacked out." He explained that he had five "bypasses" in the past, but was otherwise "very healthy." He denied chasing Perry from his room but admitted he had followed her to the nurses' desk because he "was little upset and wanted to get some activity anyhow for whatever reason."

Respondent said he was able to care for his own basic needs. He said: "[S]ome people do not realize this, but if you do not feel that mental health is curable, then you should not be in the business of doctoring. You do not have direction or attempt to cure adults. That's the way I feel, and that's the way I have to designate my feelings."

On cross-examination, respondent said he had a mortgage loan on his home from the United States Department of Agriculture in St. Louis or Jacksonville. His account number was 52. He said the people he spoke with at the Holiday Inn were all "comfortable" with him. He said: "The lady did not realize the language we were speaking or the actions we were taking as being friendly." Counsel posed the following questions:

"Q. Okay. All right. Mr. K., what is your own business? You say–

A. Own business?

Q. What is it?

A. Uh--manufacturing consultant.

Q. All right.

A. And auto merchandising and merchandising.

-10-

Q. All right. Now, you also said you have a lot of overseas contacts?

A. I did there, for instance. These people were from overseas mostly.

Q. All right. And that was when you worked at Caterpillar?

A. No, that was just the--uh--motel. I don't want to get into my business at Caterpillar. This is strictly not your concern at this time."

Respondent presented no further evidence. After closing arguments, the matter was submitted to the jury on instructions submitted by the State, without objection. Respondent did not tender any proposed instructions. The jury subsequently returned a verdict, finding respondent was a person subject to involuntary admission. The court entered a written order on the jury's verdict, ordering respondent hospitalized in the Department of Human Services for a period not to exceed 90 days. This appeal followed.

II. ANALYSIS

A. Mootness

Initially, we note this case is moot. The trial court entered an order on February 17, 2010, and limited the enforceability of the order to a period not to exceed 90 days. The 90-day duration has long passed. Thus, we must determine whether this court is able to grant any meaningful relief to respondent if we addressed the merits of his claims. See In re Robert F., 396 Ill. App. 3d 304, 310-11, 917 N.E.2d 1201, 1206 (2009). In other

words, we must determine whether any exception to the mootness doctrine applies here. In his brief, respondent asserts that all three established exceptions apply to justify our consideration of an otherwise moot issue. In contrast, the State claims that no exception applies.

The supreme court's decision in In re Alfred H.H., 233 Ill. 2d 345, 364, 910 N.E.2d 74, 85 (2009), provides guidance by discussing the applicability of the three established mootness exceptions to cases of involuntary admissions. Those exceptions are (1) the collateral-consequences exception, (2) the public-interest exception, and (3) the capable-of-repetition-yet-avoiding-review exception. Alfred H.H., 233 Ill. 2d at 355-63, 910 N.E.2d at 80-84. Whether a particular case falls within one of the exceptions must be examined case by case. Alfred H.H., 233 Ill. 2d at 355, 910 N.E.2d at 80. "This evaluation must consider all the applicable exceptions in light of the relevant facts and legal claims raised in the appeal." Alfred H.H., 233 Ill. 2d at 364, 910 N.E.2d at 85.

First, the collateral-consequences exception does not apply. This exception is applied in mental-health cases where the respondent could be plagued in the future by the adjudication at issue. See Alfred H.H., 233 Ill. 2d at 361, 910 N.E.2d at 83. When the respondent, like respondent here, has been previously committed, there are no obvious collateral consequences that can be traced exclusively to the adjudication at issue. Alfred H.H., 233 Ill. 2d at 363, 910 N.E.2d at 84 (the court could not identify any collateral consequence that could stem solely from the adjudication at issue because the respondent had previously been committed involuntarily multiple times and had been convicted of murder). Any collateral consequence that would result from the trial court's involuntary-

commitment order at issue in this appeal has already attached to respondent due to his prior hospitalizations.

However, the second and third exceptions do apply. The capable-of-repetition-yet-avoiding-review exception applies when (1) the challenged action is of such a duration that it may not be fully litigated prior to its cessation, and (2) there is a reasonable expectation that "'the same complaining party would be subjected to the same action again.'" Alfred H.H., 233 Ill. 2d at 358, 910 N.E.2d at 82, quoting In re Barbara H., 183 Ill. 2d 482, 491, 702 N.E.2d 555, 559 (1998). Although the limited duration of the 90-day commitment order prevents the case from being fully litigated within the applicable time frame, the issue presented in this appeal is capable of repetition in a subsequent action. Because this is not a case merely challenging the sufficiency of the particular evidence presented, it is possible that the issue of whether the jury was properly instructed on the State's burden of proof could arise in a subsequent mental-health case brought against respondent. Cf. Alfred H.H., 233 Ill. 2d at 360, 910 N.E.2d at 83 (there was no "clear indication of how a resolution of [the sufficiency-of-the-evidence] issue," based on the specific facts presented in that particular specific adjudication, could be of use to the respondent in future litigation).

The public-interest exception also applies for reasons similar to those explained above. This exception "allows a court to consider an otherwise moot case when (1) the question presented is of a public nature; (2) there is a need for an authoritative determination for future guidance of public officers; and (3) there is a likelihood of future recurrence of the question." Alfred H.H., 233 Ill. 2d at 355, 910 N.E.2d at 80. First,

whether a jury is properly instructed on the law, which would include an instruction on the State's burden of proof at trial, is a question of a public nature. See In re Mary Ann P., 202 Ill. 2d 393, 402, 781 N.E.2d 237, 243 (2002) ("the procedures which must be followed and the proofs that must be made before a court may authorize involuntary treatment to recipients of mental health services are matters of a public nature and of substantial public concern"). Second, there does not appear to be any authoritative determination within Illinois case law specifically requiring the trial court to instruct the jury in the manner suggested by respondent in this appeal. Third, it is possible that in the future respondent himself, or another respondent, will be the subject of a petition for involuntary admission and demand a trial by jury. In such an instance, the issue of what instructions should be given may arise. The issue presented in this appeal is not fact driven like a challenge to the sufficiency of the evidence. Instead, resolution of the issue could be helpful in similar cases in the future. Thus, we find the question on appeal presents a matter of public importance and is crucial to the conduct of fair proceedings in the future. See In re Stephenson, 67 Ill. 2d 544, 550, 367 N.E.2d 1273, 1274 (1977) (determining the State's burden of proof in involuntary-admission proceedings would "contribute to the efficient operation of our system of justice").

## B. Forfeiture

Because we find this case falls within two recognized exceptions to the mootness doctrine, we will address this appeal on the merits. As we have stated, respondent argues here that the order directing him to be involuntarily committed for treatment must be reversed because the jury was not instructed that the State had to prove

by clear and convincing evidence that respondent suffered from a mental illness.

We note that respondent raises this issue for the first time on appeal. His counsel did not raise the issue in the trial court proceedings, nor did he propose an instruction that he now argues should have been presented. Generally, an issue not presented to or considered by the trial court cannot be raised for the first time on review. In re Barnard, 247 Ill. App. 3d 234, 252, 616 N.E.2d 714, 727 (1993). Specifically, with regard to a putative jury-instruction error, a respondent forfeits review if he did not object to the instruction or offer an alternative instruction. People v. Mohr, 228 Ill. 2d 53, 64-65, 885 N.E.2d 1019, 1025 (2008).

Respondent acknowledges his procedural default, but argues that, "in the interests of justice," this court should review his claim due to the implication of the substantial liberty interests involved. In other words, respondent urges our review under a doctrine analogous to the plain-error doctrine. The plain-error doctrine set forth in Supreme Court Rule 615(a) (134 Ill. 2d R. 615(a)) applies to appeals in criminal cases, not civil cases.

In the past, this court has addressed issues raised for the first time on appeal. See In re James, 191 Ill. App. 3d 352, 357, 547 N.E.2d 759, 762 (1989); In re Franklin, 186 Ill. App. 3d 245, 248, 541 N.E.2d 168, 170 (1989); In re Satterlee, 148 Ill. App. 3d 84, 86, 499 N.E.2d 101, 102-03 (1986); In re Whittenberg, 143 Ill. App. 3d 836, 838-39, 493 N.E.2d 662, 663 (1986). However, in each of those cases, this court was asked to search the record for error upon allegations of a failure to strictly comply with statutory procedural requirements. In this case, the contention of error does not relate to noncompliance with

any relevant statutory provision. At issue is respondent's right to a fair trial and whether the jury was properly instructed regarding the State's burden of proof. Given that the Code affords a respondent the right to a jury trial, we find the issue presented here of sufficient importance to justify our review despite respondent's forfeiture. See People v. Burson, 11 Ill. 2d 360, 370-71, 143 N.E.2d 239, 245 (1957), quoting 3 Am. Jur. §248, at 33 ("'The court may, as a matter of grace, in a case involving deprivation of life or liberty, take notice of errors appearing upon the record which deprived the accused of substantial means of enjoying a fair and impartial trial, although no exceptions were preserved or the question is imperfectly presented'"). As in a plain-error analysis where a criminal defendant fails to object in the trial court to the claimed error raised for the first time on appeal, we will determine first whether any error occurred, and if so, whether respondent suffered prejudice from the error. See People v. Davis, 233 Ill. 2d 244, 274, 909 N.E.2d 766, 782 (2009).

## 1. Did Any Error Occur?

In order to prove that respondent was a person subject to involuntary commitment, the jury must have been presented with clear and convincing evidence that (1) respondent was suffering from a mental illness, and (2) due to the mental illness, he may injure himself or others, or is unable to care for himself. In re James, 199 Ill. App. 3d 316, 319, 556 N.E.2d 839, 841 (1990). "'Proof of mental illness alone is not sufficient to support involuntary admission.'" In re Robin C., 385 Ill. App. 3d 523, 529, 898 N.E.2d 689, 694 (2008), quoting In re Nancy A., 344 Ill. App. 3d 540, 555, 801 N.E.2d 565, 580 (2003). But, proof of mental illness is most certainly a prerequisite to a respondent's involuntary

-16-

admission.

The jury must be instructed on the applicable legal rules so as to guide the deliberations toward a proper verdict. Mohr, 228 Ill. 2d at 65, 885 N.E.2d at 1025. In addition to giving pattern jury instructions that apply to the particular case, the trial court should, sua sponte, issue any other instruction that, in the court's discretion, is necessary to instruct the jury on any element of the case or the State's burden of proof, for it is these issues that are imperative to a fair trial. See People v. Turner, 128 Ill. 2d 540, 562-63, 539 N.E.2d 1196, 1205 (1989). "The task of a reviewing court is to determine whether the instructions, considered together, fully and fairly announce the law applicable to the theories of the State and the defense. [Citations.] The proper standard of review is whether the trial court abused its discretion." Mohr, 228 Ill. 2d at 65-66, 885 N.E.2d at 1026. "A trial court abuses its discretion if jury instructions are not clear enough to avoid misleading the jury or if the jury instructions do not accurately state the law." In re Timothy H., 301 Ill. App. 3d 1008, 1015, 704 N.E.2d 943, 948 (1998).

In accordance with the definitions of "mental illness" and "person subject to involuntary admission" set forth in sections 1-129 and 1-119 of the Code (405 ILCS 5/1-129, 1-119 (West 2008)), respectively, the jury was instructed as follows:

"Mental illness means a mental or emotional disorder that substantially impairs a person's thought, perception of reality, emotional process, judgment, behavior, or ability to cope with the ordinary demands of life but does not include a developmental disability, dementia, or Alzheimer's disease

-17-

absent psychosis, a substance[-]abuse disorder, or an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

The respondent will be subject to involuntary admission if because of his mental illness, he is unable to provide for his basic physical needs so as to guard himself from serious harm without the assistance of family or outside help.

The respondent will be subject to involuntary admission if because of his mental illness, he is reasonably expected to inflict serious physical harm upon himself or another in the near future which may include threatening behavior or conduct that places another individual in reasonable expectation of being harmed.

The State has the burden of proving by clear and convincing evidence that the respondent, because of his mental illness, is unable to provide for his basic physical needs so as to guard himself from serious harm without the assistance of family or outside help, or that the respondent, because of his mental illness, is reasonably expected to inflict serious physical harm upon himself or another in the near future which may include threatening behavior or conduct that places another individual in reasonable expectation of being harmed.

In order to find the respondent subject to involuntary admission, the State must prove either one or both of the following propositions:

First proposition: That the respondent, because of his mental illness, is unable to provide for his basic physical needs so as to guard himself from serious harm, without the assistance of family or outside help; or

Second proposition: That the respondent, because of his mental illness, is reasonably expected to inflict serious physical harm upon himself or another in the near future, which may include threatening behavior or conduct that places another individual in reasonable expectation of being harmed.

If you find from your consideration of all the evidence that either one or both of these propositions has been proved by clear and convincing evidence, you should find the respondent subject to involuntary admission.

If you find from your consideration of all the evidence that neither one of these propositions has been proved by clear and convincing evidence, you should find the respondent not subject to involuntary admission."

Indeed, the instructions given to the jury did not explicitly convey that the State had the burden of proving by clear and convincing evidence that respondent suffered

from a mental illness. There exists no pattern jury instruction addressing the issue nor was a nonpattern jury instruction tendered. Though it could be argued that such a proposition was implicit in the instructions tendered, the jury could have, given the language of the instructions, reasonably assumed that respondent's mental illness was a given, or an element it need not resolve, and that it was only a matter of determining whether respondent's mental illness would result in harm to himself or another, or in him not being able to care for his basic needs without assistance. Because the instructions did not make clear a necessary element of the issues involved, namely, the extent of the State's burden of proof, we find it was error to not include an instruction explicitly conveying each and every factor that the State was required to prove in order to support a finding that respondent was a person subject to involuntary admission. See Timothy H., 301 Ill. App. 3d at 1016, 704 N.E.2d at 948 (to ensure a fair trial in an involuntary-treatment case, the jury should be instructed on the elements ultimately authorizing the involuntary treatment and the applicable burden of proof).

### 2. Was Respondent Prejudiced by the Error?

However, our analysis cannot end with a determination of error given respondent's failure to properly preserve the error for review. We must also determine whether the error justifies reversal. "'An error in a jury instruction is harmless if it is demonstrated that the result of the trial would not have been different had the jury been properly instructed.'" Mohr, 228 Ill. 2d at 69, 885 N.E.2d at 1028, quoting People v. Pomykala, 203 Ill. 2d 198, 210, 784 N.E.2d 784, 791 (2003). We cannot say that the trial court's failure to explicitly instruct the jury in the manner argued here by respondent

-20-

denied him his due-process right to a fair trial.

The evidence presented at trial clearly demonstrated that respondent suffered from a mental illness. Dr. Patil testified that he diagnosed respondent with paranoid schizophrenia. Supporting the doctor's diagnosis were the facts that Dr. Patil had (1) met with respondent every day during his hospitalization, (2) observed and recounted respondent's symptoms, which were consistent with the diagnosis, and (3) reviewed respondent's medical records, which indicated that respondent had suffered from the illness for "a number of years," including prior hospitalizations. A medical opinion as to the existence of a mental illness is clear and convincing if the expert "indicates the basis of his diagnosis by having directly observed a respondent on several occasions." In re Tuman, 268 Ill. App. 3d 106, 111, 644 N.E.2d 56, 59-60 (1994).

Dr. Patil's expert testimony, coupled with (1) the testimony of the remaining witnesses regarding respondent's behavior and (2) the lack of any evidence to the contrary, was sufficient for the jury to find that respondent suffered from a mental disorder which substantially impaired respondent's perception of reality, satisfying the definition of a mental illness. We find that, given the weight of the evidence presented at trial that respondent suffered from a mental illness, the fact that the jury was not specifically instructed that the State was required to prove the existence of a mental illness by clear and convincing evidence was harmless error. Given the record before us, we find the result of the trial would not have been any different had the jury been properly instructed.

### III. CONCLUSION

For the foregoing reasons, we affirm the trial court's judgment.

Affirmed.

KNECHT and TURNER, JJ., concur.