**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (3d) 180086-U

Order filed April 6, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2020

| | | |
|---|---|---|
| *In re* T.M., a Person Found Subject to Involuntary Commitment and Involuntary Medication | ) ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois |
| (The People of the State of Illinois, | ) ) | |
| Petitioner-Appellee, | ) ) | Appeal No. 3-18-0086 Circuit No. 18-MH-23 |
| v. | ) ) ) | |
| T.M., | ) ) | Honorable Alicia N. Washington |
| Respondent-Appellant). | ) | Judge, Presiding |

_____

JUSTICE O'BRIEN delivered the judgment of the court.
Presiding Justice Lytton and Justice Wright concurred in the judgment.

_____

**ORDER**

¶ 1    *Held*:   Trial court did not err when it granted the State's petitions to involuntarily admit T.M. where the evidence established that T.M. was mentally ill and due to his mental illness he could harm himself or others or was unable to care for himself. The trial court did err when it granted the State's petition for involuntary administration of psychotropic medication where the State failed to provide adequate written information about the medication it wished to administer.

¶ 2 T.M. was the subject of petitions for involuntary admission and involuntary administration of psychotropic medication. The trial court granted both petitions. T.M. appealed. We affirm the trial court's grant of the petition for involuntary admission and reverse its order granting the petition for involuntary administration of psychotropic medication.

¶ 3                                                    FACTS

¶ 4 The State filed petitions for involuntary admission and involuntary administration of psychotropic medication concerning T.M. and a hearing took place on the State's petitions on January 23, 2018. T.M.'s mother, Debbera H., testified. T.M., who was 30 years old, had a history of mental illness and was treated with medication for attention-deficient/hyperactivity disorder (ADHD) from the age of 6 to the age of 15, when he stopped taking his medication. He engaged in criminal activities when he was young, such as robbing the neighbors' houses and spent the last 15 to 16 years in and out of prison. He had recently been doing alright until he started smoking crack cocaine and K2, a synthetic cannabinoid. At this point in the testimony, T.M. inserted that he liked K2 because it allowed him to zone out.

¶ 5 Debbera continued. T.M. had been working at Burger King but quit after he started smoking the drugs. T.M. interjected that he quit his job because everyone was talking and tripping him out. Debbera described that in the last three months, T.M.'s troubling behaviors included threatening to blow his head off, stating Satan took his soul and talking improperly about the Bible. He had previously made threats about a gun, which he knew how to use. T.M. had been living with her until four months earlier when she kicked him out because he had been smoking K2 in her garage. T.M. again interjected, stating that he also stole money from her, which he said was the main reason she kicked him out.

2

¶6        On cross-examination Debbera admitted T.M. had been bathing and eating and had not caused any physical harm in the last three months, although she expressed that she had seen a deterioration in T.M.'s ability to reason or communicate in that time period.

¶7        Thomas Boyd, a second-year resident training to be a psychiatrist, testified that he had examined T.M. that morning and every day for the past eight days. He shared his personal observations of T.M. and stated that he was treating T.M. for unspecified psychosis. Boyd prescribed Zyprexa for T.M., who refused to take it.

¶8        Narayan Reddy, a medical doctor and psychiatrist, testified. He was T.M.'s treating doctor during his involuntary hold. T.M. was admitted by his mother because of his delusions. He needed prompting to bathe and eat and was helped by aids. T.M. had a history of mental illness and he submitted that his drug use might have caused a "flair of the underlying [mental illness] symptoms." Reddy believed a six-month period was needed to reach a diagnosis. He also stated that T.M.'s behaviors in the hospital supported a mental illness diagnosis. However, Reddy could not determine whether T.M. was suffering from the side effects of K2 or from mental illness. He opined that were T.M. not admitted, he would engage in harmful activities. Reddy specifically mentioned T.M. might follow through with his threats to acquire a gun to blow out his brains if released.

¶9        T.M. moved for a directed verdict, arguing the State had not proved T.M. suffered from mental illness because the doctors did not know if T.M.'s psychotic behavior was caused by mental illness or was a side effect from using K2. The trial court granted the directed verdict, finding that T.M.'s behavior was caused by either mental illness or the drug's side effects. T.M. was discharged following the hearing.

¶ 10    On January 24, 2018, the State filed another petition for the involuntary commitment of T.M. and a petition for the involuntary administration of psychotropic medication. The admission petition alleged that T.M. suffered from mental illness and as a result of his mental illness; he was likely to harm himself or others; he could not provide for his basic needs; he was unable to understand the need for treatment; and he was in need of immediate hospitalization. The petition further provided that T.M. heard voices telling him to rape a nurse; he believed that people were pursuing him; he was on a high security alert by the government; he was being pursued by the Federal Bureau of Investigation (FBI) and needed to flee; he was able to hear everyone's thoughts; and he was in need of immediate hospitalization.

¶ 11    The petition for involuntary administration of psychotropic medication stated that T.M. had a mental illness with active psychosis and threats of harm to himself and others and that T.M. lacked the capacity to give informed consent to his treatment. The petition referred to Zyprexa, Haldol and Risperidone as preferred drugs to treat T.M. The petition also requested the following tests as necessary for safe administration of the drugs: complete blood count, comprehensive metabolic panel, drug levels, and an electrocardiogram. The drugs were antipsychotic drugs used to treat schizophrenia and bipolar disorder. Attached to the petition was a supplemental petition referencing the following drugs as treatment options for T.M.: Prolixin, Thorazine, Invega, Zyprexa, Abilify, Depakoke, Ativan, Cogentin. The list included dosage ranges and treatment periods. The drugs included antipsychotic medication and medications designed to combat the side effects from the other medications. T.M. was provided information on all the drugs and their side effects except Thorazine but he refused the information.

¶ 12    Two inpatient certificates of examination were included with the petitions. The first one described T.M. as delusional and paranoid. It stated the same circumstances as the petition and

4

added that he said he would acquire a gun and rob someone and "shoot stuff up" in order to obtain money to buy K2. The second certificate referenced T.M.'s delusional thoughts, sexual threats to others and suicidal comments, noting that T.M. authored a suicide note during his last admission. The certificate further provided that T.M. groped a nurse while being admitted and laughed about his actions.

¶ 13　　　　A bifurcated hearing took place on both petitions on January 30, 2018. T.M.'s mother, Debbera, testified in accord with her prior testimony at the earlier hearing. She also described that T.M. had recently been threatening to hurt himself and other people, saying he would blow off his head if he had a gun and would rob a bank. He had blisters the size of her hand from physically running away from imaginary law enforcement he believed were shooting at him. Debbera opined that the K2 caused T.M. to snap back into mental illness. After T.M. was released from the recent attempted admission, he went to her friend's house and told her he needed to go to the courthouse to talk to the FBI. The friend decided to take T.M. to the local Salvation Army shelter and called Debbera in route. During the conversation, Debbera overheard T.M. saying he needed a gun to rob a bank and kill himself. On cross-examination, Debbera admitted she had no firsthand knowledge of T.M.'s interactions after he was discharged. Debbera explained T.M. had been out of prison for two years and had served time in the regular penitentiary, not in a secured mental health facility.

¶ 14　　　　The next witness was Andrew Lancia, the medical director at Unity Point Behavioral Health and the attending physician on the psychiatric floor where T.M. was staying. He had examined T.M. that morning. He had significant concerns about T.M.'s recent discharge because of T.M.'s psychotic beliefs and suicidal and homicidal comments. He outlined T.M.'s prior hospitalizations, including in 1997, 2000 and 2017. During the immediate prior involuntary temporary hold, T.M. wrote a suicide note and held ongoing psychotic beliefs about the FBI. His

current symptoms included delusions about the FBI, his belief that he had undergone surgery where "fruity crack smoke" was blown into his chest resulting in the implementation of some sort of device. T.M. told Lancia that T.M. did not have to answer Lancia's questions because Lancia was reading T.M.'s mind and knew the answers.

¶ 15    Lancia stated T.M.'s behavior was a sign and symptom of mental illness. He diagnosed him with unspecified schizophrenic spectrum and other psychotic disorder, commonly referred to as psychosis unspecified, as set forth in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5). It was the same diagnosis as the first admission. T.M. lacked any insight into his illness. He would engage in future conduct that would harm himself or others if he were released. Lancia pointed to T.M.'s comments about suicide, his desire to rape a nurse and his desire for a gun as support that T.M.'s behavior would be harmful. Lancia opined that T.M.'s threat to harm himself or others negated his actual ability to care for his basic needs. T.M. could not hold a job. T.M. did not have Social Security disability but did have a Link card. According to Lancia, T.M.'s mental illness caused him to be unable to provide for his basic needs, and without medications, T.M.'s condition would continue to deteriorate. Lancia opined there was a real likelihood that T.M. would carry out his threats. For example, he could go to the courthouse to find the FBI. Lancia opined that T.M.'s mental illness prevented him from understanding the need for medication. A less restrictive option was not appropriate under the circumstances.

¶ 16    On cross-examination, Lancia said he could not necessarily discount drugs as the cause of T.M.'s mental illness. He discussed the link between cannabis smoking at an early age and schizophrenia and suggested that T.M.'s use of K2 could have lowered the threshold and brought out the symptoms of mental illness. T.M.'s symptoms could be the lingering effect of using K2 or actual schizophrenia. On redirect, Lancia explained that K2 is a compounding factor that can cause

psychosis and dangerous behavior. The psychotic behaviors could disappear once the K2 left his system or T.M.'s symptoms could be caused by an underlying psychotic disorder. Lancia clarified that T.M. qualified for a diagnosis of schizophrenia. He also pointed to the "compounding factors" of K2, which could cause psychosis and dangerous behaviors. His preferred course would be to give T.M. sufficient time and see if the psychotic behaviors disappeared or continued. He could not offer a specific date but suggested that if T.M.'s behaviors did not disappear after two months sober and he remained at the same level of psychosis, the likelihood was that T.M. suffered from a "true underlying psychotic disorder such as schizophrenia."

¶ 17 The State rested and T.M. moved for a directed verdict. He argued that the State again failed to offer clear and convincing evidence that he suffered from mental illness. The trial court denied the motion and granted the petition for involuntary commitment.

¶ 18 A recess was taken and the hearing on the petition for the involuntary administration of medication took place. Lancia again testified. Medication was part of T.M.'s treatment plan. T.M. was provided a list of the medication options, their side effects and benefits from the different medications Lancia would use to regulate his behavior. T.M. had previously taken some of the medications without any side effects. In Lancia's opinion, the benefits from the medications outweighed any harm from them. T.M. refused to take the medication, saying he did not need them. T.M.'s mental illness prevented him from making an informed decision regarding medications. No other alternatives to treatment were available. T.M. should improve with the medications and would deteriorate without them. On cross-examination, Lancia explained that the multiple medications on the list were suggested medications and may be tried to determine which gave T.M. the best results with the least side effects. The trial court granted the State's petition for involuntary administration of psychotropic medication. T.M. appealed the grant of both petitions.

¶ 19                                    ANALYSIS

¶ 20        T.M. raises five issues on appeal: whether the case is moot; whether the trial court erred in granting the State's petitions for involuntary commitment and for involuntary administration of psychotropic medication; whether the petition for medication administration must be reversed if the commitment order is reversed; and whether T.M. was denied effective assistance of counsel.

¶ 21        We begin with the first issue, whether our review is precluded because the case is moot. T.M. argues that although he was subjected to 90-day orders which have since elapsed, making the case moot, all three exceptions to the mootness doctrine: the public interest exception, the capable of repetition yet evading review exception and the collateral consequences exception, apply.

¶ 22        We agree the case is moot and reviewable under the mootness exceptions. Both orders expired in April 2018. Generally, Illinois courts will not decide moot questions, render advisory opinions or consider issues where the court's decision will not affect the result. *In re Mary Ann P.*, 202 Ill. 2d 393, 401 (2002). The exceptions to the mootness doctrine enable a court to consider an otherwise moot issue. *In re Vanessa K.*, 2011 IL App (3d) 100545, ¶ 14. This court reviews *de novo* whether a case is moot. *Id.* ¶ 13.

¶ 23        The first exception we examine is the public interest exception. Under the public interest exception, a moot case may be considered when "(1) the question presented is one of a public nature; (2) there is a need for an authoritative determination for future guidance of public officers; and (3) there is a likelihood of future recurrence of the question." *In re Alfred H.H.*, 233 Ill. 2d 345, 355 (2009). The procedures to be followed and the proofs to be required in mental health proceedings are matters of a public nature and public concern. *Mary Ann P.*, 202 Ill. 2d at 402. The same failures by the State continue to occur in mental health commitment and medication

8

administration proceedings such that continued guidance to public officials may abate the problems. *In re Sharon H.*, 2016 IL App (3d) 140980, ¶ 31.

¶ 24     T.M. has been involved in prior mental health proceedings and will likely continue to be such that resolution of the claims on appeal will provide direction to him and to others subject to involuntary commitment and administration of medication proceedings in the future. We find T.M. has satisfied the requirements for the public interest exception to apply. We will address his claims on appeal under this mootness exception.

¶ 25     We next address whether the trial court erred when it granted the State's petition for involuntary commitment. T.M. submits that the State's petition for involuntary commitment was *res judicata* as the court had found the week before that the State did not prove T.M. suffered from mental illness and his diagnosis had not changed in the interim. According to T.M., the trial court's prior finding that the State failed to prove by clear and convincing evidence that he was mentally ill prohibited the State from presenting the commitment petition at issue on appeal.

¶ 26     "The doctrine of *res judicata* provides that a final judgment on the merits rendered by a court of competent jurisdiction bars any subsequent actions between the same parties or their privies on the same cause of action." *Rein v. David A. Noyes & Co.*, 172 Ill. 2d 325, 334 (1996). The doctrine bars not only what was actually decided in the first action but also what could have been decided. *Hudson v. City of Chicago*, 228 Ill. 2d 462, 467 (2008). The three requirements for *res judicata* to apply are (1) a final judgment on the merits rendered by a court of competent jurisdiction; (2) identity of cause of action; and (3) identity of parties or privies. *Id.* We review *de novo* whether a claim is barred by *res judicata*. *Lutkauskas v. Ricker*, 2015 IL 117090, ¶ 43.

¶ 27     The parties do not dispute that the first *res judicata* requirement is met. We agree. At the first hearing, the trial court directed a verdict in favor of T.M., which constitutes a final judgment

9

on the merits. See *In re L.R.*, 106 Ill. App. 3d 244, 249 (1982) ("allowance of a motion for a directed verdict is a final, non-appealable judgment of acquittal"). We also agree with the parties that the third requirement is met. The State and T.M., identical parties, were involved in both proceedings. *In re Connors*, 255 Ill. App. 3d 781, 783 (1994) (the State is the real party in mental health proceedings). The second requirement is in dispute.

¶ 28    T.M. argues that he satisfied the second requirement. He submits that the same allegations that he suffered from mental illness requiring hospitalization were presented in the prior petition and the instant one and rejected by the trial court at the hearing on the first petition. He further submits that the experts at both hearings testified that they could not determine mental illness or effects from K2 as the cause of T.M.'s psychosis. He maintains there was no change of circumstances between the denial of the first petition and the submission of the second petition, making *res judicata* applicable and barring the second petition.

¶ 29    A second petition is *res judicata* in the absence of any change of circumstances since the discharge order on the first petition. *Id.* at 784. However, the person discharged from the first proceeding is not immune from subsequent petitions for involuntary admission. *Id.* The State must demonstrate a change of circumstances before the person subsequently may be involuntarily admitted. *Id.* A change of circumstances involves " '[m]aterial operative facts occurring after the decision of an action with respect to the same subject matter [that] may in themselves, or taken in conjunction with antecedent facts, comprise a transaction which may be made the basis of a second action not precluded by the first.' " *Id.* at 785 (quoting Restatement (Second) of Judgments, § 24, Comment *f*, at 203 (1982)). Even a slight change of circumstances may be adequate for a second petition. *Id.* (citing Restatement (Second) of Judgments, § 24, Comment *f*, at 203 (1982)).

¶ 30 Debbera, T.M.'s mom, testified at both hearings. At the second hearing, she explained T.M. had shown up at the friend's house after his discharge and sought a ride to the courthouse so he could confront the FBI. The friend decided to take T.M. to the local Salvation Army shelter and called Debbera in transit. During the phone call, Debbera overheard T.M. state he needed a gun to rob a bank and to kill himself. T.M. objected to this testimony as hearsay. The trial court overruled the objection, supporting our interpretation that the testimony demonstrated that Debbera actually overheard T.M. make the comments at issue and negating T.M.'s claim of hearsay.

¶ 31 We consider this information provided by Debbera to be a change of circumstances from the last petition. We further consider the fact that T.M. sought a ride to the courthouse to talk to the FBI as an additional fact demonstrating a change of circumstances. There was no evidence presented at the first hearing that T.M. took any steps in furtherance of his delusions as he did after his discharge. Lancia's testimony also established a change of circumstances. Lancia testified that he examined T.M. the morning of the second hearing. In addition, he reviewed T.M.'s admission notes and medical records. They indicated that T.M. continued to make comments about obtaining a gun and killing himself. T.M. said people were telling him to rape a psychiatric nurse and he in fact groped a nurse during the admission process. The evening before the hearing T.M. said he saw military personnel and shadow figures. Based on this information, Lancia opined that there was a real likelihood T.M. would carry out his threats. In contrast, at the first hearing, Reddy testified it was unclear whether T.M. was hearing voices and in her opinion, T.M. "might" hurt himself or someone else. Because a change of circumstances occurred between T.M.'s discharge on the first petition and the filing of the second petition, *res judicata* does not apply to bar the second petition.

¶ 32 We now consider whether the trial court erred in entering the commitment order. T.M. argues that the State failed to prove that he suffered from mental illness as opposed to adverse

11

effects from smoking K2. T.M. contends that because substance abuse cannot form the basis for involuntary commitment, the petition cannot stand.

¶ 33    To qualify for an involuntary admission for inpatient treatment, the State must prove the person, because of his mental illness (1) can reasonably be expected to engage in conduct harmful to himself or others; (2) cannot provide for his basic physical needs to avoid serious harm without assistance from others; or (3) refuses treatment or to adhere to a treatment plan, cannot understand the need for treatment because of the mental illness, and if not hospitalized, is reasonably expected to deteriorate based on behavioral history. 405 ILCS 5/1-119(1)-(3)(i)-(iii) (West 2018). In determining whether a person satisfies the requirements of paragraphs (1) through (3), the court may consider "evidence of the person's repeated past pattern of specific behavior and actions related to the person's illness." 405 ILCS 5/1-119 (West 2018). " 'Mental illness' means a mental, or emotional disorder that substantially impairs a person's thought, perception of reality, emotional process, judgment, behavior, or ability to cope with the ordinary demands of life, but does not include *** a substance use disorder ***." 405 ILCS 5/1-129 (West 2018).

¶ 34    To sustain a petition for involuntary admission, the State must establish that the respondent suffered from mental illness and because of the mental illness may harm himself or others or is unable to care for himself. *In re Charles K.*, 405 Ill. App. 3d 1152, 1164 (2010). The State must prove the petition for involuntary admission by clear and convincing evidence. *In re Diana M.*, 364 Ill. App. 3d 715, 719 (2006). Where the person's conduct may be caused by issues other than mental illness, it is inappropriate for the court to grant a petition for involuntary commitment. *Id.* at 720. A trial court's commitment order will not be reversed unless it is manifestly erroneous. *In re John N. Jr.*, 374 Ill. App. 3d 481, 486 (2007).

12

¶ 35    T.M. points to the testimony of Lancia, who discussed the interaction between K2 and T.M.'s mental illness as support for his claim that the court improperly granted the petition based on his conduct that was caused by K2 and not mental illness. T.M. misconstrues Lancia's testimony and the trial court's conclusions regarding it. Lancia stated that T.M. was currently suffering from delusions and believed Lancia could read his mind. Lancia expressly stated that T.M.'s behavior was a "sign and symptom of mental illness." Lancia further opined that T.M. lacked insight into his illness, would likely engage in harmful conduct if released, had expressed suicidal and homicidal comments, was unable to care for his basic needs as a result of the mental illness, and that without treatment, T.M.'s condition would further deteriorate. Lancia stated that there was a real likelihood that T.M. would follow through with his threats.

¶ 36    Lancia considered that drugs could not be discounted as a cause of T.M.'s mental illness. He explained that K2 may have brought out T.M.'s mental illness and clarified that K2 is a "compounding factor" that can cause psychosis and dangerous behaviors. He noted that T.M.'s behaviors had lasted at least six months, a longer period than the three months he had been smoking K2 and indicating mental illness was the basis for T.M.'s behaviors. Lancia classified T.M.'s diagnosis as schizophrenic spectrum and other psychotic disorders, referred to as psychosis unspecified, a diagnosis in the Diagnostic and Statistical Manual of Mental Disorders (DSM-5). The trial court's decision to grant the petition for involuntary commitment was supported by the evidence. Lancia testified that T.M. suffered from a mental illness and because of his mental illness, he could harm himself or others and would be unable to care to his own needs. We find the trial court did not err in granting the petition for involuntary admission.

¶ 37    The next issue is whether the trial court erred when it granted the State's petition for involuntary administration of psychotropic medication. T.M. argues that the State failed to meet

13

the statutory requirements, asserting the State did not prove he had a serious mental illness and lacked capacity to make a reasoned treatment decision. T.M. further argues the State failed to provide him written information on the proposed medications and their side effects.

¶ 38        A person may involuntarily be given psychotropic medication if the State has proven the person meets the following criteria: (A) has a serious mental illness; (B) and because of the mental illness, the (i) person's ability to function has deteriorated as compared to prior to the onset of symptoms; he is (ii) suffering; or (iii) engaged in threatening behavior; (C) the illness has existed for a period that included the symptoms set out in (B) or a repeated cycle of their occurrence; (D) treatment benefits outweigh any harm; (E) the person is without the capacity to make a reasoned decision about treatment; (F) less restrictive services have been considered and rejected as inappropriate; and (G) any testing and procedures requested are "essential" to safely and effectively administer the treatment. 405 ILCS 5/2-107.1 (4)(A)-(G) (West 2018).

¶ 39        Where proposed mental health services include the involuntary administration of psychotropic medication, the recipient must be advised in writing of the side effects, risks and benefits of the treatment and any alternatives to it "to the extent such advice is consistent with the recipient's ability to understand the information communicated." 405 ILCS 5/2-102(a-5) (West 2018). The recipient's doctor must determine and verify in writing whether the recipient has the capacity to make a reasoned decision about treatment. 405 ILCS 5/2-102(a-5) (West 2016). Unless the risks and benefits are explained to him, a person cannot make a reasoned decision on a course of treatment. *Vanessa K.*, 2011 IL App (3d) 100545, ¶ 20. We review *de novo* whether the State complied with the statutory requirements for the involuntary administration of psychotropic medication. *In re Maureen D.*, 2015 IL App (1st) 141517, ¶ 26. We will not reverse a trial court's

14

order granting a petition for involuntary administration of psychotropic medication unless it was against the manifest weight of the evidence. *Id.*

¶ 40 We find the State established the criteria for the administration of psychotropic medications. Lancia testified to the severity of T.M.'s mental illness and how it negatively affected his ability to function and caused him to engage in threatening behavior. That fact that T.M. was interested in killing himself suggests that he was suffering. T.M.'s mother testified that he had experienced mental health issues throughout his life and had recently been smoking K2 for several months, although his behaviors had existed for at least six months. Lancia reviewed records from T.M.'s prior hospitalizations. Treatment with medication would alleviate some, if not all, of T.M.'s symptoms and in Lancia's opinion, would be preferable to any harm that would result from medication's side effects. Significantly, Lancia testified that without treatment, there was a real likelihood that T.M. would engage in behavior harmful to himself and others. Lancia opined T.M.'s mental illness kept him from making reasoned decisions about treatment. Less restrictive services were not appropriate and medications were needed.

¶ 41 Notwithstanding the State's satisfaction of the above criteria, it did not follow the statute's mandate that T.M. be provided written information on all of the listed medications Lancia wished to administer. T.M. was provided information on the preferred medication and all the alternative medications except one, Thorazine. Because the involuntary administration of psychotropic drugs implicates liberty interests, we must strictly construe the statute allowing it. *In re Bobby F.*, 2012 IL App (5th) 110214, ¶ 26. The State was required to present evidence that T.M. was provided written notification of the side effects, risks and benefits of all the proposed medication. *In re A.W.*, 381 Ill. App. 3d 950, 957 (2008). It did not do so. We acknowledge that T.M. refused any of the information regarding the medications. Nevertheless, the State is statutorily required to provide

15

information on all possible medications the treating doctor is considering in order that the recipient be able to make an informed decision whether to take the medication. Without adequate information, the recipient has no opportunity to determine his mental health treatment as to medications. The statute required that T.M. be advised of the side effects, risks and benefits of the treatment and any alternatives. While the State proved T.M. met the criteria for involuntary administration of medication and he received the bulk of the required information on the medications, he did not receive all of the mandated information. We do not consider the State's burden to be onerous in complying with the statute and emphasize that the State must satisfy the statutory requirements before it can administer drugs to a mentally ill person. Accordingly, we reverse the trial court's order granting the involuntary administration of psychotropic medication to T.M. Because of our disposition of this issue, we need not consider the fourth issue on appeal, whether the petition for administration of medication must be reversed if the order for commitment is reversed. Because we have reversed the order allowing involuntary administration of psychotropic medication, we need not resolve this issue.

¶ 42        The final issue is whether T.M. was denied effective assistance of counsel. T.M. argues that he received ineffective assistance of counsel, claiming his attorney failed to hold the State to its requirement to submit a predispositional report to the court.

¶ 43        A person who is the subject of petitions for involuntary commitment or administration of psychotropic medications is statutorily entitled to the assistance of counsel. 405 ILCS 5/3-805 (West 2018). The *Strickland* standard is used to determine if counsel provided effective assistance in mental health proceedings. *In re Carmody*, 274 Ill. App. 3d 46, 55 (1995). Under *Strickland*, the person claiming ineffective assistance must prove that his attorney performed deficiently, the errors were serious such that counsel was not functioning as contemplated and counsel's errors

16

prejudiced the person such that he was deprived of a fair hearing. *In re Jessica H.*, 2014 IL App (4th) 130399, ¶ 23. In commitment hearings, the question is " 'whether the respondent's counsel acted so as to hold the State to its burden of proof and its procedural requirements.' " *Id.* ¶ 25 (quoting *Carmody*, 274 Ill. App. 3d at 56).

¶ 44    The State must prepare a predispositional report in civil commitment hearings. 405 ILCS 5/3-810 (West 2018). The report must include "information on the appropriateness and availability of alternative treatment settings, a social investigation of the respondent, a preliminary treatment plan, and any other information" ordered by the court. *Id.* The plan must describe the problems and needs of the recipient, treatment goals and proposed treatment methods as well as a timetable for the treatment plan. The report shall be considered in determining an appropriate disposition if the court finds the respondent is subject to involuntary admission. *Id.* Section 3-810 requires a written report. *In re Robinson*, 151 Ill. 2d 126, 132-33 (1992). However, the absence of a report is harmless error where the testimony presented includes the required information. *Id.* at 135.

¶ 45    The record includes a treatment plan with goals and timetables to meet them. Other information as required in the report was provided to the court by the testimonies of T.M.'s mother and Lancia. They both described T.M.'s behavior, his inability to function and his need for hospitalization and medication. Lancia used T.M.'s prior records in assessing him and determining a course of treatment. Lancia explained that he had explored less restrictive options and they were not appropriate for T.M. The information provided on alternative options to committing T.M. was that he was homeless; had quit his job to smoke K2 and was not currently capable of holding down a job; and was without resources besides his Link card to care for himself. The testimonial and other documentary evidence was sufficient to satisfy the statutory requirements for a written

17

predispositional report. Accordingly, we consider counsel did not fail to hold the State to its burden and was not ineffective.

¶ 46                                          CONCLUSION

¶ 47          For the foregoing reasons, the judgment of the circuit court of Peoria County is affirmed in part and reversed in part.

¶ 48          Affirmed in part and reversed in part.